UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | | PRISONER |
| CARLOS LLORENS | : | CIVIL NO. 3:CV1717(AVC)(TPS) |
| v. | : | |
| DEPUTY COMMISSIONER TOKARZ, ET. AL. | : | January 29, 2006 |

**DEFENDANTS' MEMORANDUM OF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This is a civil rights action under 42 U.S.C. §1983 brought by the plaintiff, Carlos Llorens, a  Connecticut state prisoner convicted of murder for killing a member of the Latin Kings, against  present and former Connecticut state prison officials. The defendants are Jack Tokarz, the former Deputy Commissioner of the Department of Correction (DOC),  Rev. Anthony Bruno, Director of Religious Programs and Services for the DOC,  Deacon Robert Gale, a DOC Chaplain, at Cheshire CI where plaintiff is incarcerated, Correction Officer Bickford, who wrote a disciplinary report on March 15, 2002, after plaintiff had been found in possession of gambling and betting slips, and documents indicating he was keeping point spreads,  and Scott Hadlock, a former correctional counselor at Cheshire CI, now working as a correctional lieutenant at Garner CI.   Plaintiff alleges that he is a  follower of Santeria. Complaint, Sec. V., ¶15. He sues Chaplain Gale, even though Chaplain Gale allowed plaintiff to register his religious affiliation as a Santero,  [follower of Santeria]. Id. ¶¶15, 16, 17.   On October 26, 2001, plaintiff received permission from Deputy Commissioner Tokarz to purchase one set of white Santeria beads, which were given to him on May 30, 2002. Id. ¶¶ 21, 28.

Plaintiff asserts a claim of violation of his constitutional right to free exercise of religion. For the reasons stated below, and set forth in the supporting affidavits and moving papers, defendants' motion for summary judgment should be granted.

## FACTS

The facts of this case are not in material dispute, and are based on the affidavits of Major Luis Irizarry, Deputy Commissioner Brian K. Murphy, Father Anthony J. Bruno, former Commissioner John Armstrong, Correction Officer Bickford, [1] Captain Carlone (with pictures attached), and Captain Valeriano, and are set forth more fully in the Defendants' Local Rule 56(a) Statement, which is incorporated by reference herein. In part, a recitation of some of the facts is set forth to enable the Court to more fully understand the facts and issues in this case.

Carlos Llorens is a Connecticut state prisoner convicted of murder for killing a member of the Latin Kings. He is serving a thirty five year sentence for murder and is presently incarcerated in the Protective Custody unit at Cheshire Correctional Institution (CCI). [2] Due to serious concerns for plaintiff's safety and a request by plaintiff's counsel, Attorney Frank Riccio, plaintiff is housed in a protective custody unit. Plaintiff's counsel alleged that there was a contract on plaintiff's life by the Latin Kings. [3]

Ironically, plaintiff demands in this case to wear multi-color beads, beads which would easily be recognized as gang identifiers, and which, in fact, would seriously jeopardize his own personal safety. For some time now, plaintiff has been allowed one set of white beads, which

---

[1] See docket sheet in this case, Doc. ## 20, 21, 22, and 24, already on file on which defendants rely in part in support of the instant summary judgment motion.

[2] See Irizarry affidavit, ¶ 18; Murphy affidavit ¶9.

[3] See letter from Attorney Riccio, dated March 24, 1995, asserting the belief that plaintiff would be "dead within a week." Irizarry aff. ¶21; Murphy aff. ¶¶ 8, 9.

was approved by former Deputy Commissioner Tokarz.[4] In this regard, plaintiff is treated in the same fashion as other religious practitioners of other faiths, who also are only allowed one single, plain color of beads. For example rosary beads are only allowed in one plain color,

It is not disputed that the Department of Correction (DOC) has a written policy directive, A.D. 6.14, which governs how the DOC manages inmates affiliated with gangs, which are called Security Risk Groups (SRG). [5] A.D. 6.14 provides for the close custody monitoring of such groups, as well as segregated management for inmates classified as Security Risk Group Safety Threat Members (SRGSTM). Paragraph 5 of A.D. 6.14 provides, in part,

> **S**uch monitoring and reporting shall include organizational structure, chain of command, bylaws, creed, names and titles of individual inmates connected with Security Risk Groups and **<u>identifying colors</u>**, tattoos, hand signals or other common identifiers.  **(emphasis added).**

Inmates are also governed by A.D. 9.5, the Code of Discipline which provides in paragraphs 10. U and 10 V. as follows:

> U. <u>Security Risk Group Affiliation</u>. Possessing or displaying any materials, symbols, colors or pictures of any identified security risk group; or behaviors uniquely or clearly associated with a security risk group.
> V. <u>Security Risk Group Safety Threat</u>. Activity, behavior, status as a recognized Security Risk Group Leader or involvement in an event associated with a Security Risk Group which jeopardizes the safety of the public, staff or other inmate(s) and/or the security and order of the facility.

Thus, even possession of the colored beads which plaintiff wishes to possess could subject plaintiff, first, and  most importantly to serious physical assault, as well as to both discipline and

---

[4] See affidavit of Fr. Bruno and attachments thereto; see also photos attached to affidavit of Capt. Carlone.

[5] The DOC A.D. 6.14 is found at: http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0614.pdf (viewed Jan . 25, 2006); hard copy, attached to Irizarry affidavit.

the subsequent  protective management measures of A.D. 6.14.   Irizarry aff.¶15;  See A.D. 6.14;

A.D. 9.5, Affidavit of Deputy Commissioner Brian Murphy, ¶ ¶8, 9.

The colors that inmate Llorens wants to wear are colors which are identical to known and

designated SRG's. For example, Mr. Llorens want to wear red and black beads. These are the

colors worn by the Bloods. I understand he wants to also wear blue and white beads. Blue is a

color associated with the Crips.  Blue and red is associated with the Solidos, a rival SRG of the

Latin Kings. Plaintiff also wants to wear green and black beads, which are the colors of the 20-

Love.[6]

Once gang colors are reintroduced into correctional facilities, under the guise of religion,

it would be impossible to keep inmates from sharing items, restringing the beads to make

different color combinations, and using beads as a form of code, to indicate not only SRG

membership, but also the rank and hierarchy of positions within the gangs. There is no adequate

solution other than a complete prohibition, and  allowing inmates to wear these necklaces under a

T-shirt is tantamount to allowing gang colors to be displayed. They would still be visible at the

back of the neck, and during times when inmates go bare-chested, for example in the housing

units, going to and from showers, or during recreation activities in the gym or yard, during warm

weather.

 Connecticut DOC has been a leader in the nation in implementing an effective SRG

management program. Connecticut's programs have served as a model for other jurisdictions,

_____

[6] See affidavit of Captain Valeriano, with attached request from inmate Llorens, together
with the list of known gang colors and the New Jersey Media article, dated January 25, 2006, an
article concerning expert testimony regarding the Bloods' use of red beads. Plaintiff, in fact,
wanted to order red beads. This is not disputed. See lists from both  Mr. Llorens, and the list of
colors known by Gang Intelligence Coordinators to be the verified colors of the gangs.

including the Federal Bureau of Prisons. Connecticut hosted one of the first National Major Gang Task Force Conferences. The National Major Gang Task Force (NMGTF) is committed to providing leadership and information within the criminal justice system and other stakeholders to minimize the effects of security threat groups, gangs and terrorists in jails, prisons and communities. See http://www.nmgtf.org/. Valeriano aff. ¶ 7.[7]

In the professional opinion of Deputy Commissiner Murphy, former Commissioner Armstrong, Captain Irizarry, Captain Valeriano, and virtually every other corrections professional familiar with this case, it would be a grave security mistake to allow various colored Santeria beads to be introduced into the correctional environment. It would inevitably lead to a flood of similar claims by other inmates for a variety of multi-colored religious objects, e.g. headwear, bandanas, headbands, and other items, and in this case, would seriously jeopardize not merely safety and security in general, but also the personal safety of the plaintiff, who has been the target of death threats and a contract on his life by the Latin Kings.[8]

At the same time, the plaintiff has available to him reasonable opportunities to practice his Santeria faith. He is allowed a small area in his cell to maintain what plaintiff has described as a "shrine." See affidavit of Capt. Carlone and photographs attached thereto. Bruno aff.¶14.

---

[7] The NMGTF has been nationally recognized in the criminal justice system for achieving uniqueness in gang intervention and management strategies. The integration and partnerships between corrections, law enforcement, military and education has resulted in obtaining successful state criminal indictments and Federal Racketeer Influence Corrupt Organization (RICO) prosecutions with multiple defendants. In addition the NMGTF Executive Board members and State Coordinators have provided valuable technical assistance in the development of state-wide gang/security threat group programs in numerous jurisdictions. Connecticut has been a leader in this process, and the methods used by Connecticut have become leading standards across the country. As part of his duties Captain Valeriano is the Connecticut state coordinator to the NMGTF. Valeriano aff.¶8.

[8] Valeriano aff.¶ 9. Murphy aff. ¶¶ 8, 9; Irizarry aff. ¶ 21; Armstrong aff.¶ 4.

Santeria practitioners are allowed one set of plain white beads, an approved set of Tarot cards, publications, literature, approved religious articles from the commissary such as rosary beads (one plain set), and a medicine bag (leather pouch), and oils, for example. See Bruno aff. ¶13; photos attached to Carlone affidavit. In addition, plaintiff may meet on an individual basis with his Santeria priest from the community as individual professional clergy visits are permitted. Bruno aff.¶13; Armstrong aff.¶ 10 The demands for religious articles always have to be balanced with safety and security concerns, as well as equal protection concerns in providing reasonably comparable treatment to all the various faith groups and religious denominations. Armstrong aff.¶ ¶ 10-13. The DOC provides for reasonable and comparable opportunities for religious practice for all faith groups and denominations, and provides Santeria practitioners, specifically the plaintiff, reasonable accommodations for practicing his Santeria faith, while at the same time protecting the plaintiff's safety, as well as the safety and security of other inmates and staff. Armstrong aff. ¶¶10–13.

## SUMMARY JUDGMENT STANDARD

Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c) Fed. R. Civ. P.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  See also, Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam).  A party may not rely "on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986). The party opposing a motion for summary judgment "may not rest upon the mere allegation or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e) Fed. R. Civ. P.

In discussing the history and propriety of summary judgment motions, the Supreme Court noted:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1 ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

A party is not permitted to create his own "genuine" issue of fact simply by presenting contradictory or unsupported statements. See Securities and Exchange Commission v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Thus, "[w]here the record could not lead a rational trier of facts to find for the non-moving party, there is then no 'genuine issue for trial.'" Clements v. County of Nassau, 835 F.2d 1000, 1004 (2d Cir. 1987); Terry's Floor Fashions, Inc. v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985) (burden is on the plaintiff to produce evidence). A mere "scintilla of evidence" is not sufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the jury reasonably could find for the nonmoving party. Anderson, 477 U.S. at 252. The record in this case, even when considered in a light most favorable to the plaintiff, fully supports the granting of summary judgment in favor of the defendants.

## ARGUMENT

## I. THE WEARING OF SANTERIA BEADS PRESENTS A SUBSTANTIAL RISK OF SERIOUS HARM TO PLAINTIFF

### A.   Defendants Have A Constitutional Duty to Provide for Plaintiff's Personal Safety

Under Farmer v. Brennan, 511 U.S. 825, 828 (1994) correctional officials have a so-called "duty to protect" inmates from a substantial risk of serious harm.("[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.")   In this case, plaintiff is incarcerated for the murder of a Latin King gang member. His lawyer, Attorney Frank Riccio wrote a letter to the Department of Correction stating that if not given protective custody measures, plaintiff would be "dead within a week." See Riccio letter dated March 24, 1995 attached to Irizarry affidavit.  In the professional judgment of the defendants, allowing plaintiff to wear various colored Santeria bead necklaces would identify him as an SRG member who is an enemy to the Latin Kings, thus presenting a substantial risk of serious harm or even risk of death to plaintiff.  While defendants do not dispute that wearing Santeria beads are an important part of a protected religion, see e.g. Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520 (1993), there is a more important, compelling interest here, i.e. protecting the life and safety of the plaintiff himself, as well as maintaining a correctional facility free of gang colors which inevitably leads to gang conflicts and violence. Defendants find themselves in a constitutional "catch-22," caught between the balancing of plaintiff's right to personal safety under Farmer, and his right to free exercise of religion, within the safety and security constraints of prison life. Under these circumstances, defendants' good faith professional judgments entitle them to qualified immunity from any money damages.

Plaintiff's claimed religious beliefs qualify for First Amendment purposes. See  Church of the Lukumi Babalu Aye, Inc., supra, 508 U.S. at 531 (finding Santeria  faith to be a protected religion for First Amendment purposes by detailed consideration of evidence, submitted by plaintiff, church's tenets and religious practices and services). However, unlike the District Court decision in Campos v. Coughlin,  854 F.Supp. 209 (S.D.N.Y. 1994), there is specific evidence here not only that the beads plaintiff requests to wear reflect known gang colors, but also, and most importantly, that the wearing of these colors would present a substantial risk of serious harm or death to the plaintiff himself.  See Campos,  854 F. Supp. at 209 (noting "defendants have not shown that there has been any attempted or actual illicit use by any prison gang of Santeria  beads" and have "failed to dispute plaintiffs' allegations that they are not gang members or that the beads they request to wear do not reflect any known gang colors"). (emphasis added)  Here, it is immaterial if plaintiff is a gang member or not, because he is convicted of killing a known Latin Kings gang member, and his own attorney states that his life is in danger due to the perception that plaintiff is a gang member or an enemy of the Latin Kings.  Indeed, plaintiff's attorney asserts that the Latin Kings have put out a contract on plaintiff's life. See Riccio letter dated March 24, 1995, attached to Irizarry affidavit.

In a case involving Black Dikr beads used by Muslim inmates in reciting prayer, a District Court recognized the compelling interest in reducing gang related violence in prison. See Alameen v. Coughlin, 892 F. Supp. 440, 449-450 (E.D.N.Y. 1995)  In Alameen, the District Court noted that "defendants have established a compelling interest at stake here: the undisputed evidence establishes that gang-related violence poses a threat to the security of guards and other prisoners. The existence of a separate and independent system of authority  directly threatens the

security and stability of the institution as a whole, and it is undisputed that wearing identifying colors in the forms of beads provides an organizing device which is subversive of prison authority. Since beads are used as a symbol of identity, unity, and authority by various gangs, prison officials have a compelling interest in restricting the use of the beads. The gangs pose a direct threat to prison authority as catalysts for violence and disorder, and prison officials are entitled to take measures to inhibit gang activity."[9] (emphasis added)

In Campos v. Coughlin, 854 F. Supp. 209 (S.D.N.Y. 1994), the District Court was not faced with an inmate convicted of murder and serving a 35 year sentence for killing a Latin King member. Moreover, the District Court decision denigrated or at the very least minimized the legitimate security concerns of the New York prison officials, contrary to a subsequent admonition of the United States Supreme Court in Lewis v. Casey, 518 U.S. 343 (1996). In Lewis v. Casey, the Supreme Court reiterated that District Courts should not second guess prison officials with regard to security decisions and should defer to their experience in managing prisons. The Supreme Court expressly stated, in part,

---

[9] None of the reports provided by the parties at trial in Alameen clearly documented the use of colored beads as a device for establishing gang membership. After the hearing, the Court drew the parties' attention to a newspaper article appearing in the New York Times Magazine. See Adrian Nicole LeBlanc, Gang Girl, N.Y. Times Magazine, Aug. 14, 1994, at 26. Neither side disputed the depiction in the article of the use of colored beads by gang members to display their allegiance, and defendants responded with a news article discussing gang problems at Riker's Island, including the statement that "there is no attempt to hide group affiliation. Beads are worn openly around the neck: black and gold for the Latin Kings, white, red, and black for the Netas." Mireya Navarro, The Inmate Gangs of Rikers' Island, N.Y. Times, May 8, 1994 at 9. In view of this undisputed evidence that gangs use colored beads to identify themselves and to communicate plans for gang activity, it would be not merely irresponsible, but constitutionally impermissible under Farmer v. Brennan, to allow plaintiff to wear Santeria beads which would readily be perceived as a gang identifier, thereby jeopardizing his personal safety and presenting a substantial risk of serious harm or death to plaintiff.

The District Court here **failed to accord adequate deference to the judgment of the prison authorities** in at least three significant respects....
First, the court concluded that ADOC's restrictions on lockdown prisoners' access to law libraries were unjustified....
Second, **the injunction imposed by the District Court was inordinately -- indeed, wildly -- intrusive....**
Finally, the order was developed through a process that failed to give adequate consideration to the views of state prison authorities....

Lewis v. Casey at 362. The same could easily be said about the District Court's order in Campos, and indeed, it is likely that the Campos Order, had it been appealed and reviewed on the merits, would not have been affirmed after Lewis v. Casey. See Hoevenaar v. Lazaroff, 422 F.3rd 366, 370 (6th Cir. 2005)( reversing the grant of an injunction and holding, even under RLUIPA, that the court improperly substituted its judgment for that of prison officials.) The District Court in Campos did not apply the strict scrutiny test of RFRA with appropriate regard to deference due to prison officials in managing Security Risk Groups in prisons, a judgment call especially well suited for prison officials, and particularly ill-advised for district courts to make.[10]

The Supreme Court, in Thornburgh v. Abbott, 490 U.S. 401 (1989), a case involving the dangers of introducing into a prison environment publications that would jeopardize security, noted that once inside a facility, inmates share and circulate items amongst the general inmate population, thus increasing the dangers to safety and security, and requiring the application of the reasonableness test expressed in Turner v. Safley. 482 U.S., at 81, 87, 89. Specifically, the

---

[10] It is also clear that times have changed and thinking has changed regarding proactive management of prison gangs. Connecticut is a leader in the country in managing prison gangs which has resulted in far safer correctional facilities. Campos is also distinguishable because Riker Island did not have any standard uniforms, allowed gangs to control housing areas, and had high level of assaults and uses of force which resulted in numerous injuries to inmates when staff physically had to use force to regain control of the facility. See Murphy affidavit, ¶5 and NY Times article, dated October 30, 2005, "In City Jails, a Question of Force; Blows to Inmates' heads Are Too Routine, a Lawsuit Charges," attached thereto.

Court declined to apply the <u>Martinez</u> standard in "prisoners' rights" cases because, as was noted in <u>Turner</u>, <u>Martinez</u> could be (and had been) read to require a strict "least restrictive alternative" analysis, without sufficient sensitivity to the need for discretion in meeting legitimate prison needs. 482 U.S., at 89-90. The Court expressed concern that "**every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand**," id., at 89, and rejected the costs of a "least restrictive alternative" rule as too high. <u>Id.</u>, at 90. <u>See also</u> <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 350 (1987) (refusing to apply a least restrictive alternative standard for regulation of prisoner work rules having an impact on religious observance). <u>Thornburgh</u> at 410-411 (emphasis added). This is precisely what the District Court did in <u>Campos,</u> concluded that there was a "least restrictive way" of providing Santeria beads, disregarding safety and security concerns voiced by prison officials. The district court in Campos erred, because it did not have an adequate factual record, and it did not apply the appropriate deference due to prison officials even after RLUIPA, as explained further below.

**B.   RLUIPA Does Not Require Subordination of Security Interests to Religious Claims**

The fact that plaintiff's claim in this case may be analyzed under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C.S. §§ 2000cc et seq., yields no different result, with regard to deference to prison administrators. <u>Brunskill v. Boyd</u>, No. 04-15152, 2005 U.S. App. LEXIS 8135 (11th Cir May 10, 2005)(dismissal of a Native American prisoner's claims based on first amendment and RLUIPA was proper because a hair length policy and denial of religious materials were least restrictive means in furthering compelling

governmental interests in security, health, and safety.)   The Supreme Court in <u>Cutter v. Wilkinson,</u> 544 U.S. ____, 125 S. Ct. 2113 ( 2005) stated:

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.

<u>Cutter v. Wilkinson</u>, 125 S.Ct. at 2122. The Supreme Court has long recognized the need to defer to the judgment of prison  administrators when evaluating the validity of a  prison  regulation that impinges an inmate's First Amendment rights. <u>See</u>, <u>e.g.</u>, <u>Procunier v. Martinez</u>, 416 U.S. 396, 404-05, (1974). The Supreme Court noted:  "Courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . .  Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities."  <u>Id</u>. at 405.

     In <u>Jones v. North Carolina Prisoners Union</u>, 433 U.S. 119,  125 (1977) , the Court upheld prison  regulations that prohibited meetings of prisoners' labor unions, solicitations to join the union, and bulk mailings concerning the union from outside sources against a First Amendment challenge, noting that the lower court "got off on the wrong foot . . . by not giving appropriate deference to the decisions of  prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement." <u>Jones</u> makes clear that prison officials may act in a preventative manner, and do not have to wait until the eve of a prison riot to take protective measures. Prison officials have the right, indeed, the duty to anticipate security problems and enact measures which are designed to prevent security problems before they occur.

This is precisely why defendants have denied the plaintiff his requests for many different sets of colored beads, including a set of red beads, easily identifiable as the symbol of the Bloods.[11]

The Supreme Court's decision on RLUIPA in <u>Cutter</u> does nothing to change this analysis. To the contrary, the Supreme Court in <u>Cutter</u> again emphasized the continuing need to defer to the experienced judgment of prison officials stating,

> Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, *e.g.*, 139 Cong. Rec. 26190 (1993) (remarks of Senator Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Joint Statement S7775 (quoting S. Rep. No. 103–111, p. 10 (1993)).

> <u>Cutter v. Wilkinson</u>, 544 U.S. at ___; 125 S.Ct. at 2123.

## II. PLAINTIFF'S DEMAND FOR AN INJUNCTION WOULD RESULT IN FAVORED TREATMENT FOR "RELIGIOUS" INMATES IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION

Notwithstanding the fact that the Supreme Court sustained the constitutionality of RLUIPA in <u>Cutter v. Wilkinson,</u> <u>supra</u>, under the Establishment Clause, the treatment of "religious" inmates as a favored group not only causes serious security concerns, as noted in the affidavits of Major Irizarry, former Commissioner John Armstrong,  Deputy Commissioner Brian Murphy, and Captain Valeriano, but also arguably favors such "religious" claims in violation of the equal protection clause. As was noted  by the District Court for the Western District of Virginia, in <u>Madison v. Riter, </u>240 F. Supp. 2d 566 (W.D. VA 2003), <u>rev'd. and remanded</u>, 355 F.3d 310; (4th Cir.  2003) <u>cert. denied sub. nom.</u>  <u>Bass v. Madison </u>125 S. Ct. 2536

---

[11]  See Valeriano affidavit and attachments thereto.

(2005) applying the strict scrutiny test required by RLUIPA to grant religious exceptions to content neutral, generally applicable inmate property restrictions and prohibitions, would create a generously favored class of "religious" inmates who would have immunity from these generally applicable prison rules, and who would be provided multiple "religious" exemptions.[12] See Madison v. Riter, 240 F.Supp. 2nd at 577. As accurately depicted in Madison v. Riter,  at 579-580:

> Looking at the range of exceptions provided under the strict scrutiny test, it is not a logical stretch, in predicting the practical effects of RLUIPA, to imagine a prison in which religious prisoners are allowed to wear religious headgear and religious icons, have ungroomed hair and beards, receive extremist literature from outside the prison, refuse to submit to general medical tests and vaccinations, keep religious objects in their cells, and receive special diets. Meanwhile, non-religious inmates in the same prison must be clean shaven, wear prison issued clothing, submit to medical exams, and eat whatever is provided in the cafeteria. If the non-religious prisoner wants the same freedoms that the religious inmate possesses, he has two choices. First, if a prison regulation, such as a limitation on the inmate's ability to receive and keep photographs deemed obscene by prison officials, arguably burdens his First Amendment freedoms, the inmate may choose to challenge the regulation under the deferential *Turner* rational relationship test. Second, the inmate could claim religious rebirth and cloak himself in the protections of RLUIPA, a possibility that concerned courts under RFRA. See  *Sasnett*, 908 F. Supp. At 1444 [*Sasnett v. Sullivan*, 908 F. Supp. 1429 (W.D. Wis.1995)]   ("Proof of religiosity is especially important in the prison context because of the potential that prisoners might use religion as a pretext  to achieve other goals."). n12 Whatever choice the inmate makes, the practical effect of RLUIPA on the prison system in the United States is to grant religious and professed religious inmates a multitude of exceptions and benefits not available to non-believers.

The Fourth Circuit in reversing and remanding  in Madison 355 F.3d at 321, noted:

> **RLUIPA still affords prison administrators with flexibility to regulate prisoners' religious practices** if the Commonwealth "demonstrates that

---

[12]   In reversing, the Fourth Circuit expressly stated, "RLUIPA  should not hamstring the ability of the Commonwealth's correctional officials to ensure order and safety in the Commonwealth's prisons." 355 F.3d at 321

imposition of the burden on that person - (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest."  42 U.S.C. § 2000cc-1(a).

Id. at 321 (emphasis added). The Fourth Circuit further noted that:

In the cases litigated under RFRA, federal **correctional officials have continued to prevail the overwhelming majority of the time.** See Developments in the Law -  Religious Practice in Prison,   115 Harv. L. Rev. 1891, 1894 (2002). This fact suggests that **RLUIPA should not hamstring the ability of the Commonwealth's correctional officials to ensure order and safety in the Commonwealth's prisons.**

Thus, the emphasis on safety and security placed in analyzing RLUIPA claims by both the United States Supreme Court in Cutter, and the Fourth Circuit, make it clear that in a case such as this one, where plaintiff is seeking to wear colored beads which would likely jeopardize his personal safety, even his life, that the balance of interests weighs far more heavily in favor of the prison officials, who have a compelling interest in keeping plaintiff safe, despite his own wishes to wear these Santeria beads. Quite frankly, wearing these beads could result in plaintiff being killed.

The  District Court for the Western District of Virginia (Turk, J) in Madison correctly noted the unique society of a closed prison population, and the practical effects of such favored treatment for a group of "privileged" "religious" inmates, for example gang members signing up to be "Santeria" worshippers,  stating:

The political community affected by RLUIPA in the present case is a unique one, as members of this community are already in a position in which conformity  is a mandated norm. See  Amatel, 156 F.3d at 198 ("Prisoners of course differ from the other examples of individuals entangled with the government in that they have no recourse to a private sphere. For them, there is no outside. Judges plainly must bear in mind the total occupation of prisoners' lives by the state."). Rules are dictated to inmates by prison administrators, and obedience is supported by the power of forcible retribution. In such a community of limited freedoms,

exceptions to prison rules and regulations are fervently sought after by prisoners, and even the smallest exceptions, including religious exceptions, can lead to feelings of jealousy among fellow inmates. See Dehart, 227 F.3d at 52-53 (recognizing how the provision of special religious diets can lead to inmate jealousy); Johnson v. Horn, 150 F.3d 276, 282 (3d Cir. 1998) (holding that the request of a religious inmate for a special diet causes other inmates to think that the religious inmate is receiving special treatment, leading to harassment); Garrett v. Gilmore, 926 F. Supp. 554, 557 (W.D. Va. 1996) (recognizing that allowing exceptions to prison regulation "easily" engenders jealousy among inmates); Udey v. Kastner, 644 F. Supp. 1441, 1447 (E.D. Tex. 1986)(warning that the provision of exceptions leads to numerous inmate claims), aff'd, 805 F.2d 1218 (5th Cir. 1986).

The Madison Court added:

RLUIPA, in placing religious inmates in such a position of power, requires a prison to measure "the effects of ... action on an objector's spiritual development," effectively making a religious inmate "a law unto himself." See Smith, 494 U.S. at 885, 110 S. Ct. at 1603

Applying the foregoing principles to plaintiff's demand for Santeria items makes it clear that defendants' concern for safety and security is a compelling overriding interest requiring the Court to reject plaintiff's demand for Santeria beads. To grant an injunction for an individual inmate creating a right to wear numerous strands of multiple colors of beads, creates a de facto inmate in a position of favored status or power, and has the legal effect of giving all inmates, including SRG inmates, a protected right to wear numerous strands of colored beads and maintain a wide variety of inmate "religious shrines."[13] This would allow a designated gang

---

[13] It appears that at present the issue of an "in-cell shrine" is moot, as defendants have determined that as long as plaintiff allows his items to be inspected, and it is kept private, it does not endanger security and he has been allowed to keep it. See Carlone affidavit; Bruno aff. ¶ 14. Thus, there is no need for an injunction order on this point, and it should be denied as moot. Importantly, cell inspections of these items must be allowed, and in the future, if there is a compelling security concern, defendants must have the flexibility and discretion to prohibit certain items which might endanger health and safety. For example, defendants would not allow

member to wear gang colors, for instance, "green and black" beads, which are the known gang colors of the 20-Love, or red beads, the color of the Bloods. See Valeriano aff.¶ 5. This would clearly facilitate gang communication and jeopardize the safety of staff and inmates alike. Inmates could easily use the particular colors or combinations of colors to signal the onset of a prison work stoppage, instigate a disturbance, or signal a "green light" to commence an assault or "hit" on particular staff person and/or other inmates.[14]

However, notwithstanding these immediate security concerns, the plaintiff moves for a mandatory injunction, ordering the introduction of such colored beads and shrines into the state's many correctional facilities. Seeking to convince this Court to balance the plaintiff's religious demand more heavily than the defendants' security interests, the Santeria inmate plaintiff implicitly claims he is constitutionally entitled to wear a recognized Security Risk Group (SRG), gang's colors, because for him they have religious significance. The similarly situated "non-religious" inmate who is a member of the Security Risk Group, could not wear such colors. Such favored treatment for religious claims for religious inmates has the obvious overwhelming effect of advancing religion to the detriment of even handed prison policies promoting safety, security, good order and discipline. It would obviously result in a flood of inmates signing up to

_____

animal sacrifices or animal blood to be stored, even though under <u>Church of Lukumi Babalu Aye v. City of Hialeah</u>, 508 U.S. 520 (1993) such practices might be permissible in the free world community, despite certain zoning laws.

[14] In <u>Espinoza v. Wilson,</u> 814 F.2d 1093 (6th Cir. 1987), a prisoner First Amendment case applying a least restrictive means test, <u>id</u>. at 1098, the Court held that, once prison officials have provided expert testimony sufficient to justify the security regulation and resultant impingement of prisoner rights, "the courts must defer to the expert judgment of the prison officials unless the prisoner proves by 'substantial evidence . . . that the officials have exaggerated their response' to security considerations." Id. at 1099. <u>See also</u> <u>Hoevenaar v. Lazaroff</u>, 422 F.3rd 366, 370 (6th Cir. 2005) (reversing injunction granted on RLUIPA clam because the district court did not properly defer to security concerns of prison officials which RLUIPA requires).

be Santeria worshippers so that they could wear their gang colors under the guise of a religious practice.

The <u>Madison</u> Court also correctly recognized the disparate treatment for religious inmates in seeking the same written publication, for example White Supremacist literature which is sought by two similarly situated inmates, a "non-religious" inmate who claims to be a member of the Aryan Nation, and a "religious" White Supremacist inmate who claims to be a "religious" practitioner of the Church of Jesus Christ Christian (CJCC).

> Assume, for example, that a prison official confiscates white supremacist literature held by two different inmates. One inmate is a member of the Aryan Nation solely because of his fanatical belief that a secret Jewish conspiracy exists to control the world. The second inmate holds the white supremacist literature because he is a member of the Church of Jesus Christ Christian, Aryan Nation ("CJCC"). The non-religious inmate may challenge the confiscation as a violation of his rights to free expression and free association. A court would evaluate these claims under the deferential rational relationship test in *Turner*, placing a high burden of proof on the inmate and leaving the inmate with correspondingly dim prospects of success. *See Haff v. Cooke*, 923 F. Supp. 1104 (E.D. Wis. 1996). However, the religious inmate, as a member of the CJCC, may assert a RLUIPA claim, arguing that the confiscation places a substantial burden on his religious exercise. The religious white supremacist now has a much better chance of success than the non-religious white supremacist, as prison officials bear the burden of proving that the prison policy satisfies a compelling interest and is the least restrictive means of satisfying the interest. *See id*. at 1115 ("If this court applied a RFRA test more stringent than the *Turner* test, this court would force prisons to favor prisoners' religious material over their secular material because prisons would need a better justification to confiscate religious material than political material.")

See <u>Madison v. Siter</u>, 240 F.Supp. at 576.

### A.  <u>The Promotion of Religious Exceptions Fosters "Big Wheels" In Prisons</u>

The late Judge Blumenfeld correctly anticipating <u>Jones v. N.C. Prisoners' Union</u>, decided three years later, rejected a demand for a prisoners' union at CCI-Somers, in <u>Paka v.</u>

Manson, 387 F. Supp. 111 at 121-122 (D. Conn. 1974) citing the court's awareness of the violence and potential for violence in prison, and citing to the  Second Circuit Court of Appeals which has noted that "[the] authoritarian ' boss' inmate  is no  chimera. " Sostre v. McGinnis, supra, 442 F.2d at 202 n. 47. Inmate leaders or "big wheels" in prison are a significant security concern, and the wearing of colored beads can easily be used to signal gang leadership. See Irizarry aff. ¶ 8; Armstrong aff.¶ ¶6, 8. [15]

### B.  There Are No Zones of Privacy in Prisons and Jails

In Paka,  387 F. Supp at 121-122, Judge Blumenfeld derived, "[a]dditional guidance in making an analysis of whether the restriction challenged in this case is inconsistent with the plaintiff's status as  a convicted  prisoner may be derived from other cases adjudicating the legality of restraints on the associational rights of prisoners. In upholding the dismissal of a prisoner's action  alleging that his right to privacy was violated by monitoring his conversations with prisoners, the court in   Christman v. Skinner, 468 F.2d 723, 726 (2d Cir. 1972), quoted

---

[15] The federal BOP prohibited inmate press interviews. The Bureau's principal justification for its interview ban has become known  as the " big wheel" phenomenon.  The phrase refers generally to inmate  leaders.  The Bureau argues that press interviews with "big wheels" increase their status and influence and thus enhance their ability to persuade other prisoners to engage in disruptive behavior.  As a result security is threatened, discipline impaired, and meaningful rehabilitation rendered more problematical than ever.

There seems to be little question that "big wheels" do exist  and that  their capacity to influence their fellow  inmates  may have a negative impact on the correctional environment of penal institutions.  Whether press interviews  play a significant role in the creation of "big wheels" or in the enhancement of their prestige was a subject of dispute in the District Court.  With appropriate regard for the expertise of   prison administrators, that court found that the problems associated with the " big  wheel"  phenomenon "are all real considerations and while somewhat impressionistic, they are supported by experience and advanced in good faith."  Washington Post v. Kleindienst,   357 F.Supp. 770, 774 (D.D.C. 1972)

from Lanza v. New York, 370 U.S. 139, 143, 8 L. Ed. 2d 384, 82 S. Ct. 1218 (1962), "'that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.'" Protection of privacy does not extend to the inmates of a prison confined there after a due process determination that they have violated criminal laws. Conviction of crime carries not only loss of liberty, but also other impairments associated with membership in a closely supervised prison community. The range of free activity for prisoners within the prison is relatively small." Paka at 121-122.

## C. RLUIPA Does Not Create A Cause of Action for Money Damages

The plaintiff alleges, in part, that his rights under RLUIPA have been violated. This federal statute presents novel and complex legal issues which requires a compelling state interest to justify a substantial burden on an institutionalized person's religious exercise. See McEachin v. McGuinness, 357 F.3d 197 (2d Cir. 2004)(noting that RLUIPA may present complex legal issues). RLUIPA creates a private right of action. [16] Any person may "assert a violation of this

---

[16] Defendants deny there is even individual liability for damages (that is, damages liability against government employees in their individual capacities) under RLUIPA. Cf. Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996) (Americans with Disabilities Act, 42 U.S.C.A. §§12101-12213, does not provide for individual liability); Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir.1991) (no individual liability under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e-17); Smith v. Capitol City Club of Montgomery, 850 F. Supp. 976, 978 (M.D. Ala. 1994) (Thompson, J.) (same). See Smith v. Haley, 401 F.Supp. 2nd 1240 (M.D. Ala. Dec. 1, 2005)(Rluipa does not provide for individual money damages); But see Orafan v. Goord, 2003 U.S. Dist. LEXIS 14277, 2003 WL 21972735, *10 (N.D. N.Y. 2003) (Treece, M.J.) (holding that RLUIPA allows officials to be sued for damages in their individual capacities). The Orafan case asserts in Delphic fashion, without any authority or analysis that "clearly the act contemplates individual liability." That statement does not answer the question here, whether, as relief for such alleged liability, the plaintiff can claim damages. The Orafan case is not persuasive and its statutory construction analysis is faulty.

chapter as a claim or defense in a judicial proceeding" and may obtain "appropriate relief against a government."  42 U.S.C. §2000cc-2(a).  The United States may also seek injunctive or declaratory relief to enforce the statute.  42 U.S.C. § 2000cc-2(f). Subsection (a) of  2000cc-2, states:

> Judicial relief
>
> (a) Cause of action.  A person may assert a violation of this Act as a claim or defense in a judicial proceeding and <u>obtain appropriate relief against a government</u>.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution. (emphasis added)

The plain text of the statute does not create a cause of action for money damages against individuals in their individual capacities, but rather, appears to allow for only injunctive relief against a government.  It is well established that the Eleventh Amendment and sovereign immunity bar monetary relief against a state government, agency, or state official in their official capacity.  <u>See</u> <u>Will v. Michigan Dep't. of State Police</u>, 491 U.S. 58, 71, 109 S. Ct. 2304,  105 L. Ed. 2d 45 (1989). Thus, the only "appropriate relief" which may be awarded against a government is prospective injunctive relief to remedy an ongoing constitutional violation.

Here plaintiff is not suing a "government" nor has he named a "government" as a defendant.  For example, under analogous circumstances involving, e.g., the Privacy Act (5 USCS § 552a) which authorizes private civil actions for violations of its provisions only against agency, and not against any individual, a petition which names only individual defendants is properly dismissed.   <u>Brown-Bey v United States</u>.720 F2d 467. ( 7th Cir.1983).  When Congress wishes to create a cause of action for damages, it knows how to do so by expressly using clear

terms and conditions in a statute authorizing a monetary damage remedy.   Compare RLUIPA

with, e.g. 7 USCS §2357  (2004).

> § 2357.   Unauthorized practice, …shall be liable in a  **civil action**  for the return
> of all money received, and **for compensation for  damage**  done by such person
> and also may be enjoined from such practice. However, there shall be no liability
> for damage if such person establishes that the work was done competently and
> without negligence. This section does not apply to anyone who, without a claim
> of self-sufficiency, works under the supervision of another who stands admitted
> and is the responsible party; nor to anyone who establishes that the person acted
> only on behalf of any employer by whom the person was regularly employed.
> (emphasis added).

There are numerous other statutes which expressly create a cause of action for damages.[17]  For

example, in Title VII, employment discrimination cases, federal law provides as follows:

> § 1981a.  Damages in cases of intentional discrimination in employment
>
> (a) Right of recovery.
> (1) Civil rights.  In an action brought by a complaining party under section  706 or
> 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5 [or 2000e-16]) against a
> respondent who engaged in unlawful intentional discrimination (not an
> employment practice that is unlawful because of its disparate impact) prohibited
> under section 703, 704, or 717 of the Act  (42 U.S.C. 2000e-2 or 2000e-3 [or
> 2000e-16]), and provided that the complaining  party cannot recover under section
> 1977 of the Revised Statutes (42 U.S.C. 1981), **the complaining party may
> recover compensatory and punitive damages** as allowed in subsection (b), in

---

[17]     See e.g. 12 USCS § 1787  (2004)  Payment of insurance (h) Liability of directors and
officers.  A director or officer of an insured credit union **may be held personally liable for
monetary  damages in any civil action**  by, on behalf of, or at the request or direction of the
Board,… (emphasis added)

See also, e.g. 12 USCS §1821  (2004)(k) Liability of directors and officers.  A director or officer
of an insured depository institution **may be held personally liable for monetary  damages  in
any  civil action…see also e.g.** 16 USCS § 1443  (2004)  (c)  Civil actions  for response costs
and  damages. (1) The Attorney General, upon request of the Secretary, may commence a civil
action  against any person or vessel who may be liable under subsection  (a) for response costs
and damages.

addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964
[42 USCS § 2000e-5(g)], from the respondent. (**emphasis added**).

There is no similar language in RLUIPA which authorizes an award of damages.  To the contrary, only "appropriate relief against a government" is authorized.  Defendants respectfully suggest that phrase, due to sovereign immunity and eleventh amendment prohibitions against monetary relief, should only be construed to mean limited injunctive relief to remove substantial burdens on religious exercise which are not justified by compelling state interests.  There is no need for such injunctive relief in this case where the defendants' concerns for plaintiff's safety and security far outweigh his demand for Santeria beads, a free exercise claim,  and his claims for injunctive relief  as to a shrine are moot.

As in all statutory construction  cases, this Court should begin with the language of the statute.   The first step "is to determine  whether  the language  at  issue  has  a  plain  and unambiguous meaning with regard to the particular dispute  in the case."  Robinson v. Shell Oil Co., 519 U.S. 337, 340, (1997).  Plaintiff seems to infer that RLUIPA authorizes a civil action for damages, even though Congress expressly omitted any language concerning "damages" from RLUIPA.

The Court should not infer as much, as it is a general principle of  statutory construction that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  Russello v. United States, 464 U.S. 16, 23, 7 (1983); Keene Corp. v. United States, 508 U.S. 200, 208, (1993) ("Where Congress includes particular language in one section of a statute but  omits  it in another. . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion")

(internal quotation marks and citation omitted).  Thus, here, where Congress expressly included in a number of federal statutes an express remedy of a civil action for money damages, but carefully crafted the language in RLUIPA to limit the remedy to "appropriate relief against a government," it is reasonable to conclude that Congress did not intend RLUIPA to give rise to a cause of action for money damages, because such language has been expressly excluded.

### III.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

The applicability of  RLUIPA  to state prison officials was not clearly established in 2001 and 2002, and indeed, is still not clearly established today,  such that any reasonable officer would have known that defendants' actions violated plaintiff's  rights under  RLUIPA.  See e.g. Shabazz v. Va. Dep't of Corr.  2005 U.S. Dist. LEXIS 8891, *10  (W.D. Va. May 2, 2005). The plaintiff's first amendment free exercise claims are complex in light of the difficult balancing test which defendants must undertake.  Therefore, the Court should find that defendants are entitled to qualified immunity against the first amendment and RLUIPA  claims, and should dismiss such claims from this action accordingly, pursuant to 28 U.S.C. § 1915(e)(2).  Under this section, the court may summarily dismiss claims filed in forma pauperis if it is clear that the defendants are immune from such claims.

Other than the lone district court decision in Campos v. Coughlin, which is neither binding nor controlling for qualified immunity purposes,  to the  defendants' knowledge, no Second Circuit Court of Appeals case has held that the prohibition on wearing colored beads in prison is  unconstitutional. See Smith v. Haley, 401 F.Supp. 2nd 1240, 2005 U.S. Dist. LEXIS

30454 (N.D.Ala. Dec. 1, 2005)[18] (granting qualified immunity to prison officials where it is unclear to reasonable prison officials that depriving an inmate of a crystal, or to possess and light a small candle to practice Odinism violated his statutory right under RLUIPA in 2003).[19]

Indeed, far more intrusive security measures on prisoners' religious claims, including the forced cutting of hair, have been found constitutional, and thus, no reasonable prison official would or could understand that prohibiting the wearing of colored beads would violate clearly established constitutional rights of prisoners, in view of the unclear quagmire of law and numerous case law decisions regarding religious claims by inmates. See e.g. Fromer v. Scully, 874 F.2d 69, 74-76 (2d Cir. 1989) (sustaining a regulation limiting the length of beards to one inch); Benjamin v. Coughlin, 905 F.2d 571, 576-77 (2d Cir. 1990) (holding that pulling Rastafarians' hair back could accommodate religious beliefs without undermining the state's penological interests). In Benjamin v. Coughlin, the New York prison regulation required an initial haircut for full identification purposes and then inmates could grow their hair back. New

---

[18] The court in Smith v. Haley at *23-*24, was unable to locate any case specifically indicating that refusing to provide a practitioner of Odinism with a crystal for religious purposes violates RLUIPA. In fact, a search of all federal case law for opinions containing the two words "Odinism" and "crystal" turned up zero results. In addition, it is significant that the court could not locate any other RLUIPA case brought by prisoner practitioners of Odinism that references a request to use and possess a crystal, much less concludes that depriving an Odinist possession of a crystal violates his rights under RLUIPA.

[19] To the extent that plaintiff seeks the right to have a candle, incense or herbs, Smith v. Haley and numerous other cases hold that for fire safety reasons such items may be denied. These items present a security risk because they could be used to start fires and disguise smells, sounds and identities. See e.g. Ward v. Walsh, 1 F.3d 873, 879 (9th Cir. 1993) cert. denied. 510 U.S. 1192 (1994); Emel v. Mensenger, 1996 U.S. Dist. LEXIS 13498, *8 (E.D. Pa. 1996)(upholding bans on candles); Malik v. Woodley, 14 Fed. Appx. 779; 2001 U.S. App. LEXIS 14093 (9th Cir. 2001)(upholding ban on incense)

York prison officials only rationalized their policy based on ease of identification, not based on the ability to hide contraband in dreadlocks, and the risks that dreadlocks pose to staff who have to search through such thickly matted hair. See May v. Baldwin, 109 F.3d 557 (9th Cir. 1997)( holding that a prison policy requiring Rastafarians to loosen their dreadlocks for search was reasonable).

In May v. Baldwin the Rastafarian inmate refused to allow a search of his dreadlocks and was disciplined and placed in segregation. The Ninth Circuit held that the defendants were entitled to qualified immunity, in part, because courts had used varied reasoning and reached contradictory conclusions on the constitutionality of prison grooming regulations. May v. Baldwin, 109 F.3d at 561. See also, Harris v. Chapman, 97 F.3d 499, 503-504 (11th Cir. 1996), (applying a strict scrutiny standard pursuant to the RFRA,   Florida DOC  hair  length policy did not violate the First Amendment and RFRA since it furthered a compelling governmental interest in security and order in the  prisons,  and the policy was the least restrictive means of satisfying the governmental interest.). The Ninth Circuit in Henderson v. Terhune, 379 F.3d 709 (9th Cir. 2004) recently affirmed the constitutionality of a hair grooming policy requiring a Native American inmate to cut his hair. The Ninth Circuit reasoned that there was a clear connection between the hair  length regulation and the department of corrections' (DOC) desire to prevent inmates from quickly changing their appearance, hiding weapons and contraband in their  hair, displaying gang-related hairstyles, and maintaining a safe and hygienic  prison  environment. Also, a religious exception for the inmate's hair would place burdens on the  prison  with respect to safety-and health-related searches, and while there were alternatives to the hair-length regulation that would protect some of the DOC's asserted number of burdens on the DOC and

hamper a majority of its interests. <u>Williams v. Norris</u> , 11 Fed. Appx. 656; 2001 U.S. App. LEXIS 6164  (8th Cir. 2001)(rejecting Rastafarian inmates demand to wear dreadlocks);  <u>Green v. Polunsky</u>, 229 F.3d 486 (5th Cir. 2000)(upholding the Texas DOC grooming policy). The Firth Circuit concluded in <u>Green</u> that beards of any length could change an inmate's appearance, and would be detrimental to the  prison's  interest in identifying prisoners internally, as well as in the event of escape. Additionally, contraband could be hidden in long  hair  and beards, exposing the guards to unnecessary risks of harm. Moreover, the  grooming policy  did not deprive plaintiff of "all means of expression" of his religious beliefs. It merely removed or reduced one of many avenues by which he could manifest his faith. Similarly, here, plaintiff has several means of religious expression, including having one white necklace,  his so-called "shrine," Tarot cards, literature, oils, and individual professional clergy visits. See Carlone and Bruno affidavits.

In <u>Iron Eyes v. Henry</u>,  907 F.2d 810, 811-812 (8th Cir 1990) Iron Eyes, a Native American inmate,  desired to grow his  hair  longer than is allowed under the  prison  regulation. He believed that his hair is a gift from the Great Spirit, and he considered cutting his  hair, except to symbolize grief for the loss of a loved one, to be an offense to the Creator. Missouri prison officials twice forcibly held Iron Eyes down and cut off his hair. The Eighth Circuit concluded there was no first amendment violation because the impingement of  the prisoner's right to freely exercise his religion was outweighed by the validity of the prison's regulation.

Thus, in light of this overwhelming  weight of authority authorizing prison officials to implement grooming rules requiring short hair cuts and short or no beards, measures which forcibly compel prisoners to submit to haircuts under threats of use of force,  it was impossible for the defendants to know that they were violating any clearly established rights of plaintiff

when they denied him his Santeria beads, incense, herbs and candles,  prohibitions which do not

forcibly intrude on a prisoner's personal space or his body.  Indeed, in view of <u>Hines</u>, 148 F.3d

353, 357 (4th Cir. 1998); <u>Knightnor v. Angelone</u>, CA-00-232-7 (W.D.  Va.  Apr. 6, 2001), aff'd

18 Fed. Appx. 173; 2001 U.S. App. LEXIS 20357 (4th. Cir. 2001); <u>Bonner and  Lian J. Ross; I-

Tal  Rastafarian  Community,  Plaintiffs,  v.  Department  Of  Corrections;  Ron  Angelone,

Defendants-Appellees, and Ron De'angelo,   Virginia  Department of Corrections, Defendant.</u>13

Fed. Appx. 158; 2001 U.S. App. LEXIS 15470 (4th Cir. 2001)(affirming district court's granting

summary  judgment  in  favor  of  the  Defendants  in  action  brought  by  Rastafarian  inmates

challenging Division Operating Procedure 864, a  prison grooming policy  requiring that male

inmates' hair not be more than one inch in thickness/depth and prohibiting beards). <u>DeBlasio v.

Johnson,</u> 13 Fed. Appx. 96; 2001 U.S. App. LEXIS 14328 (4th Cir. 2001); <u>DeBlasio v. Johnson,</u>

128 F.Supp. 2nd 315 (E.D. Va. 2000) aff'd <u>Madison v. Johnson</u>, 12 Fed. Appx. 149, 2001 WL

681687 (4th Cir. 2001)(upholding constitutionality of DOP 864 because restrictions are rationally

related  to  legitimate  prison  interests  of  suppressing  contraband,  limiting  gang  activity,

maintaining  discipline  and  security,  and  "preventing  inmates  from  quickly  changing  their

appearance"),  defendants have met the onus of demonstrating that the impediments placed in the

way of plaintiff's observance of his Santeria beliefs and religious practices have a compelling

justification.  This compelling justification is based on the DOC's need to preserve plaintiff's

personal safety, the security and order of the correctional facility,  the health and safety of

inmates, maintain control and management of gangs in the Cheshire CI  facility and the DOC,

manage budgetary constraints, and deflect administrative difficulties. See  <u>Ross v. Blackledge</u>,

477 F.2d 616, 618 (4th Cir. 1973). Indeed,  disparate treatment on this basis does not necessarily

give rise to a constitutional violation. See <u>Woods v. Evatt</u>, 876 F. Supp. 756, 766 (D.S.C. 1995). Not every "religious sect or group within a prison --however few in number--must have identical facilities or personnel." <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2, 31 L. Ed. 2d 263, 92 S. Ct. 1079 (1972). It is not reasonable for the DOC to have different rules for inmates depending on how many necklaces or how colorful their necklaces are required to be by their religion. Allowing plaintiff's necklace would open the door to ornate religious necklace claims brought by Native American inmates, and would lead to an unregulated and unsafe prison environment.

The DOC defendants had every reason to believe that in light of <u>Fromer</u>, <u>Benjamin v. Coughlin</u>, <u>Hines</u>, <u>Harris v. Chapman</u>, <u>Henderson v. Terhune</u>, and other Circuit Courts of Appeals free exercise cases, as well as their respectful disagreement with the conclusion of the District Court in <u>Campos v. Coughlin</u>, that Connecticut DOC inmates could be lawfully required to comply with prison disciplinary policies which make it a disciplinary infraction to display SRG colors. [20] It is significant to note that plaintiff's ten year confinement in Protective Custody at Cheshire CI is intended to maintain his personal safety despite a contract on his life issued by the Latin Kings, as well as institutional stability and order in all Connecticut facilities, as well as the safety of all CDOC inmates by allowing former Commissioner Armstrong and Commissioner Lantz to safely manage the inmate population committed to DOC custody. In fact plaintiff was not subjected to any physical injury at Cheshire CI. <u>See</u> 42 U.S.C. § 1997e(e).

---

[20] <u>See</u> <u>Farrow v. Stanley</u>, 2005 DNH 146; 2005 U.S. Dist. LEXIS 24374, *41-*42 (D.N.H. 2005) granting qualified immunity to prison officials where there law is unclear as to whether there is a right to a sweat lodge. The case law is sufficiently unsettled for the court to conclude that there is no consensus of authority as to a prisoner's right to make use of a sweat lodge. Therefore, the district court held the right is not clearly established and defendants are qualifiedly immune from Farrow's claim for damages. The same is true in this case.

Further, it is important to remember that qualified immunity serves a number of quite important goals. Courts have expressed a concern over "the deterrent effect that civil liability may have on the willingness of public officials to fully discharge their professional duties". Sanchez v  Swyden, No. 96-40557, slip op. at 1390-91 (5th Cir. Jan. 13, 1998) (citing Pierson v. Ray, 386 U.S. 547, 555 (1967); Anderson v. Creighton, 483 U.S. 635, 638 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982); and   Scheuer v. Rhodes, 416 U.S. 232, 239-41 (1974)). Moreover, the Court should seek to "avoid excessive disruption of government". Malley v. Briggs, 475 U.S. 335, 341 (1986). To this end, qualified immunity serves to terminate a claim against a public official as soon as possible in a judicial proceeding, even before discovery. See Siegert v. Gilley, 500 U.S. 226, 232 (1991)("`Until this threshold immunity question is resolved, discovery should not be allowed.'") (quoting Harlow, 457 U.S. at 815).  Crawford-El v. Britton, 523 U.S. 574 (1998).

The bifurcated test for qualified immunity is quite familiar: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. E.g., Colston v. Barnhart, 130 F.3d 96, 99 (5th Cir. 1997); Strickler v. Waters, 989 F.2d 1375(4th Cir.) cert. denied 510 U.S. 949 (1993)(holding  in part that  qualified immunity applied). If the facts do establish a constitutional violation, however, we proceed to a second inquiry, asking "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."     Saucier v. Katz, 533 U.S. 194, 202 (2001). If a reasonable officer could have believed that the challenged conduct was lawful at the time of the violation, then  qualified immunity  bars the claim. See id.;  Luna v. Pico, 356 F.3d 481, 490 (2nd

Cir. 2004). A defendant is not  liable if he did not violate clearly established law or it was objectively reasonable for him to believe that he was not violating clearly established law. Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003). In view of the lack of any controlling Supreme Court or Second Circuit law finding the restrictions on colored beads in prisons  to be unconstitutional, and further the many courts which have upheld many other prison rules which infringe on religion, such as grooming regulations, to be completely constitutional, the defendants were entitled to rely on their professional correctional  judgments that the prohibition is necessary to keep the plaintiff and other inmates safe from violent gang activities,  and it was objectively reasonable for them to believe that restricting plaintiff to one single necklace of beads, consisting of one single, plain color, white beads, in the same manner as rosary beads, and Dhikr beads, as well as kufis and other religious articles  similarly regulated, would not violate any clearly established rights of the plaintiff.

Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits. Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982). Government actors performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818. Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act. Anderson, 483 U.S. at 641; Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (citing Malley v.

Briggs, 475 U.S. 335, 340-41 (1986)). The objective reasonableness test is met and the defendant is entitled to immunity if "officers of reasonable competence could disagree" on the legality of the defendant's actions. Malley, 475 U.S. at 341; accord Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991), cert. denied, 112 S. Ct. 3032 (1992).

Here, plaintiff has failed to meet the first prong of the qualified immunity test. Although plaintiff has alleged a violation of a first amendment right, the free exercise clause, the precise contours of the free exercise claim are not at all clearly established and even if clear, those rights have been held to be outweighed by the legitimate security interests promoted by defendants' policies. Thus, on the merits, plaintiff cannot prevail.

The responsibility imposed on public officials to comply with constitutional requirements is commensurate with the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct. It is not measured by the collective hindsight of skilled lawyers and learned judges. Even that focused hindsight cannot, in this case, justify the conclusion that limiting the plaintiff to one set of white beads violated clearly established constitutional rights. See Zepp, 79 F.3d at 388; Robertson v. Rogers, 679 F.2d 1090, 1092 (4th Cir. 1982). Absent clearly established law that proscribed defendants' specific conduct, the defendants should not be subjected to suit. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992), cert. denied, 506 U.S. 1080, 113 S. Ct. 1048, 122 L. Ed. 2d 356 (1993).

Defendants acted within the scope of their authority and used their many years of correctional experience in exercising their discretion to limit the colors of all religious beads, including rosary beads, Dhikr beads, and Santeria beads. Defendants similarly limit the colors of

kufis to one plain color, white, so as to avoid the use of colors as gang identifiers. Former Commissioner Armstrong states in his affidavit that it would be an abdication of his responsibility as Commissioner to protect the plaintiff from harm to allow him to wear colored beads. Here, the defendants are clearly in a constitutional "Catch-22." They have a constitutional obligation to protect plaintiff's personal safety, and they have an inmate who is demanding to wear colored Santeria beads which defendants have reason to believe would in effect be a "death warrant." See Armstrong affidavit ¶4. Wearing colored beads would be the equivalent of "flying the flag" and displaying gang colors which would cause the plaintiff, who is already targeted with death threats, to be perceived as a gang member rival of the Latin Kings. Armstrong aff.at 3, ¶ 4.  In so exercising their discretion, acting without knowledge they were in violation of any clearly established federally protected rights of the plaintiff, defendants are entitled to qualified immunity. Accordingly the plaintiff's claims for money damages are barred by qualified immunity and must be dismissed under 28 U.S.C.§1915(e)(2)(B)(iii).

## IV. PLAINTIFF'S REMAINING CLAIMS ARE WITHOUT MERIT

### A. Dwayne Bickford Is Not Liable for Lawfully Conducting a Cell Search and Writing a D.R.

Correction Officer Dwayne Bickford is a defendant in this case. He filed an affidavit dated February 19, 2003, nearly three years ago. It is undisputed that the only involvement by Mr. Bickford was his lawful exercise of his duties as a correction officer to conduct a cell search. See Bickford Aff. ¶3.  Hudson v. Palmer, 468 U.S. 517 (1984)(no right of privacy or to be free from cell searches).[21] Mr. Bickford found betting slips in plain sight in plaintiff's cell, along with

_____

[21] A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells  required to ensure institutional

excessive commissary items, from which a reasonable inference was drawn that plaintiff was running a gambling ring and was profiting by receiving payments of commissary items from other inmates. Bickford aff.¶ 3, 4. Bickford reported these events to his supervisor, and his supervisor, Captain Holmes also observed the excessive commissary items, and slips, and directed Mr. Bickford to write a "D.R." (Disciplinary Report), see Bickford aff. ¶ 5 and D.R. dated 3-15-02 attached thereto.

As long as plaintiff had the benefit of minimum procedural due process protections,  his action for damages resulting from the alleged filing of false charges must fail.  Freeman  v. Rideout , 808 F.2d 949 (2d Cir. 1986), rehearing in banc denied,  826 F.2d 194 (2d Cir. 1987), cert. denied,    485 U.S. 982 (1988). The Supreme Court's decisions in    Wolff v. McDonnell, 418 U.S. 539 (1974), and    Superintendent v. Hill, 472 U.S. 445 (1985),  compel this Court to conclude that plaintiff had indeed been provided with all of the procedural protections to which he was entitled. The betting slips, attached to the disciplinary report and Bickford's affidavit, which clearly identify various NFL football teams with the various points and scores together with the excess commissary items, easily meet the "some evidence" test of  Hill. There is no evidence that Bickford had anything to do with the disciplinary hearing or that he had any knowledge of plaintiff's religion. Mr. Bickford attests in his affidavit that he never spoke to plaintiff about plaintiff's religion, Bickford aff.¶6, and he suspects that plaintiff is making these

---

security and internal order.  We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.  We believe that it is accepted by our society that "[loss]  of freedom of choice and privacy are inherent incidents of confinement." Hudson v. Palmer at 527-528 citing Bell v. Wolfish, 441 U.S., at 537.

false claims against Bickford because Bickford broke up a profitable gambling operation in the housing unit. The fact that plaintiff was successful in gambling or bartering was evident from the excess commissary items that were found in plaintiff's cell.

Claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes.[22] In a civil rights lawsuit such as this one, with a claim that a state actor retaliated against a plaintiff for exercising a constitutional right,  the plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision regarding  the plaintiff.[23]  If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have issued the disciplinary report even in the absence of the protected conduct.[24]  Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977). Because of both "the near inevitability of decisions and actions by prison officials to which prisoners will take exception

---

[22] Flaherty  v. Coughlin, 713 F.2d 10, 13-14 (2d Cir. 1983)

[23] Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). To the extent that plaintiff alleges that Bickford violated plaintiff's right of access to court, Amended Complaint ¶35,  plaintiff fails to allege any actual injury, and thus, this claim is without merit. Lewis v. Casey, 518 U.S. 343, 351-352 (1996)(the fact that plaintiff successfully filed a state habeas action and the instant §1983 action defeats his claim of denial of access to court; plaintiff has no actual injury). Inmates need to be able to file complaints "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Lewis, 518 U.S. at 355. Bickford is entitled to summary judgment on plaintiff's access to court claim.

[24] Id. (quoting  Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)).

and the ease with which claims of retaliation may be fabricated," prisoners' claims of retaliation must be examined "with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2nd Cir. 1995). Sufficient reasons to justify state action are "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) (citation omitted).

Here, the disciplinary report summary after the investigation and hearing shows that plaintiff's cellmate, inmate Camacho, pleaded guilty to the report, and further stated to the investigator that half the betting slips were his, and that half belonged to the plaintiff. Plaintiff admitted, during the disciplinary hearing to possessing the slips, but merely claimed that he copied them out of a "baseball book," and that he allegedly didn't know he could not have them. Plaintiff did not make any statement contemporaneous to the disciplinary hearing, alleging that the papers that were taken from his cell were allegedly "religious papers." Thus, this claim should be viewed with extreme skepticism, and instead the Court may infer that the claim was a recent fabrication, since it was never made either at the time of the D.R nor during the appeal process.

**B. Plaintiff Fails to State A Claim as to Counselor Hadlock**

In his Amended Complaint, ¶32, plaintiff alleges that he lost his prison job, as a result of the disciplinary report guilty finding, and that Counselor Hadlock told him that there were no available jobs and plaintiff would have to wait. Even if true, it is well established that there is no constitutional right to a job in prison. McNatt v. Parker, No. 3:96CV1397(AHN)(HBF), 2000 U.S. Dist. LEXIS 20468 (D.Conn. Jan. 18, 2000) citing Newman v. Alabama, 559 F.2d 283, 292

(5th Cir. 1977), cert. denied,   438 U.S. 915, 57 L. Ed. 2d 1160, 98 S. Ct. 3144 (1978). In

Santiago v. Commissioner of Correction, 39 Conn. App. 674, 680,  667 A.2d 304,307 (1995)  the

Connecticut Appellate Court stated that "A prisoner has no property or liberty interest in prison

employment, increased recreation or educational courses. See Garza v. Miller, 688 F.2d 480, 485

(7th Cir. 1982), cert. denied,   459 U.S. 1150, 103 S. Ct. 796, 74 L. Ed. 2d 1000 (1983)." See

Manley v. Bronson, 657 F. Supp. 832, 840 (D.Conn. 1987)(no right to prison job); See also

Barlow v. Lopez, Civ. No. H85-529(PCD) (D. Conn. June 24, 1985) (a prisoner has no

constitutional right to a particular job in a correctional institution);   Banks v. Norton, 346 F.

Supp. 917, 921 (D. Conn. 1972) (same).  Thus, the claims against Mr. Hadlock fail to state a

claim for which relief may be granted, and Hadlock is entitled to summary judgment in his favor.

### C. Defendants  Lack Personal Involvement

It is well settled  that    "personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983."[25]  Neither defendant Tokarz

nor Bruno  can be held personally responsible simply because they were in a high positions of

authority in the prison system. [26]  Further,  defendants Gale, Bickford, and Hadlock were not

---

[25] Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991);  McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977), cert. denied,   434 U.S. 1087, 55 L. Ed. 2d 792, 98 S. Ct. 1282 (1978); see also    Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir.) ("The rule in this circuit is that when monetary damages are sought under § 1983, the  general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required."), cert. denied,  414 U.S. 1033 (1973).

[26] See Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985) ("Plaintiff's claim for monetary damages against [the Commissioner and Warden] requires a showing of more than linkage in the prison chain of command."); McKinnon, 568 F.2d at 934 ("The fact that [defendant Commissioner] was in a high position of authority is an insufficient basis for the imposition of personal liability."). See Wright v.  Smith, 21 F.3d 496, 501-50 (2nd Cir. 1994)(affirming District Court's summary judgment as to the Commissioner of Correction).

personally involved in the process and decision to allow one, all-white necklace of Santeria beads, and deny the request for a set of red beads,[27] then they are not liable, and the Court should grant summary judgment in favor of defendants Gale, Bickford, and Hadlock. <u>Gill v. Mooney</u>, 824 F.2d 192, 196 (2nd Cir . 1987).

<u>**CONCLUSION**</u>

For all the foregoing reasons, and for the reasons stated in the defendants' affidavits and other supporting papers, the defendants' motion for summary judgment should be granted and judgment should enter for the defendants.

DEFENDANTS
Deputy Commissioner Tokarz, et.al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct 0211
E-Mail:  steven.strom@po.state.ct.us
Tel: (860) 808-5450
Fax: (860) 808-5591

---

[27] In his Amended Complaint, plaintiff alleges he wrote to Tokarz and requested flammable items such as herbs, incense, oils and candles. The photos attached to Capt. Carlone's affidavit shows that plaintiff in fact did have oils on the shelf in his cell. See Defendants' LR 56 Stmt. The picture clearly depicts three small clear plastic bottles of oil. The herbs, incense and candles obviously would jeopardize fire safety since no flammable items, including tobacco, matches, lighters are allowed in any DOC facility. <u>See</u> fn. 19, <u>supra</u>, at 26 and cases cited therein.

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following on this  30th  day

of  January, 2006:

      Carlos Llorens, # 222201
      Cheshire Correctional Institution
      900 Highland Avenue
      Cheshire, CT 06410

                              _____
                              Steven R. Strom
                              Assistant Attorney General