UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CARLOS LLORENS,<br>*Plaintiff,* | : | PRISONER<br>CIVIL NO. 3:02CV1717(AVC)(TPS) |
| | : | |
| v. | : | |
| | : | |
| JACK TOKARZ, ET AL.,<br>*Defendants.* | : | DECEMBER 15, 2005 |

## AFFIDAVIT OF JOHN J. ARMSTRONG IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I, JOHN J. ARMSTRONG, being duly sworn, hereby depose and say that:

1. My name is John J. Armstrong. I am above 18 years of age, understand and believe in the obligation of an oath, and have personal knowledge of the facts set forth herein.

2. I was the Commissioner of the Department of Correction (DOC) for the State of Connecticut, until my retirement on March 11, 2003. I began my career as a Correction Officer at the New Haven Correctional Center, 245 Whalley Ave., New Haven CT in 1977, approximately twenty-six years ago. In my many years of experience I also served as a correctional treatment officer, lieutenant, captain, major, deputy warden and warden. I served as the Warden of the Jennings Road Detention Center from February 1989 to October 1990. I was the Warden of the Manson Youth Institution from October 1990 to March 1992. I also served as Director for Region I of DOC from March 1992 to January 1994, during which time I supervised the Wardens of CCI-Somers, Enfield CI, Carl Robinson CI, as well as Willard and Cybulski. I participated in much of the planning for Northern CI when it opened in March 1995. I was

involved in much of the planning and transitioning of Somers to Osborn CI and the downgrading of Somers from a level 4 & 5 prison, then the state's only maximum security prison, to a level 3 facility. I participated in the planning for the transfer of the Administrative Segregation program from Somers to Walker RSMU, and subsequently to Northern. I became Deputy Commissioner for Programs & Services under former Commissioner Meachum in 1994. Among the responsibilities in this position I had general supervisory administrative authority over religious programs and services. I was appointed Commissioner by Governor Rowland in January, 1995. I retired effective March 11, 2003. A copy of my resume is attached hereto as Exhibit A and is incorporated by reference herein.

       3.     I have testified in a number of state and federal cases as a qualified correctional expert, but I do not have the complete list at present, as well as given numerous affidavits and written several expert reports. One of those reports was a case brought by Lorne Acquin, a Native American prisoner incarcerated at MacDougall Correctional Institution, concerning numerous religious practices claimed by Native American inmates including sweat lodge, smudging, sacred pipe and wearing religious necklaces, including beads.

       4.     I have also given expert testimony in a wide variety of other cases claiming religious rights involving, for example, Muslim head wear, religious diets and allowing other cases seeking exceptions for religious reasons. In addition, I have applied my general and specific knowledge as the Commissioner of Correction for the State of Connecticut, as a previous Deputy Commissioner, Warden and as a correctional supervisor and staff member for more than 26 years, as well as my knowledge of the obvious ripple effects among the inmate population which are inevitably caused by allowing exceptions on religious grounds to security

policies and disciplinary rules which apply generally to all inmates in my custody. My review of the complaint, amended complaint, inmate correspondence from plaintiff, literature review, case review as well as conversations with my staff, and my general background also have made me familiar with the general situations involved in this complaint. Importantly, it has recently been brought to my attention that the plaintiff, Carlos Llorens, is serving 35 years for murder of a member of the Latin Kings. I have read the letter from Attorney Riccio dated March 24, 1995, and have reviewed the fact that for the past ten years plaintiff has been housed in protective custody due to the alleged contract on his life put out by the Latin Kings, according to Attorney Riccio's letter. Allowing plaintiff to wear colored beads would in effect be a death warrant for him, in that he would be perceived to be a member of Security Risk Groups who are known rivals and enemies of the Latin Kings. It would be an abdication of my own responsibility to protect the plaintiff even against his own wishes and lack of sound judgment, particularly regarding displaying colored beads. Such a display would be the equivalent of "flying the flag," a gang phrase for displaying colors for the purpose of identification. It would unreasonably jeopardize plaintiff's safety and would present a substantial risk of serious harm, including the risk of death, to allow plaintiff to wear multiple strands of colored beads, even if he were allowed those beads under his shirt. There are numerous times when inmates are naked to the waist, for example when walking across the day room to the shower, and at that time or in the shower, or gym, when playing without a shirt, the plaintiff's beads would be clearly visible to other inmates. There are no secrets in prison and the perception that plaintiff is a member of a SRG would be an unacceptable risk that could only be avoided by a complete prohibition on the possession of such colored beads.

5.  My ability to comprehensively discuss the issues is limited by an obvious conflict between the parties as to what the case is all about. The plaintiff's amended complaint filed October 11, 2002, as I understand it, clearly appears to be directed toward the plaintiff's alleged constitutional and statutory rights to wear multiple strands of colored Santeria beads. Plaintiff also seeks to individually engage in practice of Santeria religion, by maintaining a Santeria shrine in his cell. In effect the plaintiff does not allege nor seek assistance from this court in being provided an equal opportunity for religion comparable to that provided to other religious groups with regard to "religious" beads or "shrines". What he does complain of and what he does seek as relief is to have superior rights, greater privileges and immunity from generally applicable rules deliberately intended to reduce (SRG) gang activity, gang communication and control property, reduce contraband, and importantly reduce violence in Department of Correction facilities, a large part of which was caused by SRG activities.

6.  It should be clear to this court that no Department of Correction can maintain safety and security if inmates are allowed special privileges or are allowed to hold and to exercise leadership roles over other inmates. As noted by Judge Blumenfeld in Paka v. Manson, 387 F.Supp. 111, "[the] authoritarian 'boss' inmate is no chimera." If the Commissioner were to allow this plaintiff to have a privileged status in wearing multiple necklaces of colored beads, using colors, which known SRG's also use, as well as to maintain an individual religious shrine in his cell, then the Commissioner would have to allow such property items, privileges and protections for all inmates.

4

7.  In Connecticut, any inmate can voluntarily sign up to affiliate with any religion of his choice. I have no doubt that inmates in gangs would see this opportunity to reintroduce gang colors into Department of Correction facilities.

8.  To the extent that the plaintiff seeks the opportunity to have a "privileged" status based on religion, which as I read his complaint constitutes the primary thrust of his lawsuit, this court should reject his claims in their entirety. Among the most self evident, prominent and compelling reasons for prohibiting inmate leadership are competition, threats, extortion, favoritism, perceptions of favoritism and gang activity. In addition, and what I respectfully request this court to be mindful of is the fact that at any given time there are approximately 19,000 or more inmates confined in the various correctional facilities administered by the Connecticut Department of Correction. This case cannot be viewed as a demand by one inmate to have special privileges based on a religious exception, which is in itself dangerous. The wearing of such colored bead necklaces has been in the past a known method for prison gangs to designate leadership within the gangs. For example, a pattern of five black beads followed by two gold beads may mean an inmate is a member of the "corona" or "crown" leaders of the Latin Kings. See Irizarry affidavit. Thus, the overriding principal in this case concerns the alleged right of any one of more than 19,000 inmates to hold such power. The concern for any inmate having any leadership or power over any other inmate, is a valid, indeed compelling security concern of correctional administrators like myself. I am also concerned about the ability of inmates to conceal contraband in religious shrines maintained in an inmate's cell, being able to wear colored beads in the same gang colors used by gangs. The risk of proliferation of non-authorized items in cell together with increased tensions between inmates and staff who are

required on a daily basis to do detailed cell inspections ("shakedowns"), compels me to conclude that plaintiff's demands are dangerous for safety and security. Specifically, the demand to maintain "fruit" in the cell is particularly troubling, not only for sanitary reasons, but also because fruit may be used to produce a prison made alcoholic beverage, commonly called "pruno" by mixing fruit with sugar and letting the mixture ferment. If the Commissioner were to allow fruit for one inmate, she would in effect allow all inmates to possess fruit in their cells. This increase in contraband would be both unsanitary and if pruno is made, which is likely, extremely hazardous to safety and security.

9. My experience as a correctional administrator is such that I view the establishment of religious practice opportunities for inmates as a very important rehabilitative tool. However, I must always be alert for what is obviously the dominant theme of this case, i.e. inmate demands, even when sincerely claimed to be related to the practice of religion, which in effect, and in practice, relate to the opportunity, as noted by Judge Blumenfeld, in Paka v. Manson to be an inmate leader, which exposes inmates and staff to the very serious security problems noted above. I must, more importantly than any other goal of corrections, be mindful of the safety of the plaintiff, as well as DOC staff. The introduction of colored beads would lead to multiple requests from various inmates, since what is allowed for one must be allowed for all.

10. Indeed, in my view, the existing accommodations that the Department of Correction provides for the Santeria religion reasonably accommodates a number of Santeria requirements, compatible with safety and security, and are, in most relevant respects, comparable to similar opportunities by other inmates of other religions in the Department of Correction. Among the religious programs available for Santeria practitioners are the following:

one plain white necklace to be worn under the clothing, audio and cassette tapes, books, reading materials, approved Santeria tarot cards, individual professional clergy visits from Department of Correction authorized community volunteers, such as the "Santeria priest" claimed in paragraph 23 of the Carlos Llorens case. If plaintiff provided us with the information concerning this "Santeria priest," he could have either of two kinds of visits, a professional clergy visit, if the individual was so qualified and approved, or a social visit, if approved for the individual's social visiting list.

11. In my eight-year tenure as Commissioner since 1995, I was faced with innumerable demands for religious articles. I always tried to be fair and even handed in dealing with the multiple demands of a variety of religions. I always considered safety and security first when trying to accommodate a particular request. I also strived for equal treatment and relative parity amongst the competing demands for additional property items. For example, when faced with demands for multiple colors and types of Islamic head wear, for example, fezes, turbans, Kufis of different colors, I decided, in consultation with Imams and religious experts, to limit the religious headwear for Muslims to one standard color, and one design, a close knit Kufi. This is a standard item available in the Commissary.

12. Another example is in regard to the numerous different Native American tribes and Nations who may have demands for religious headbands, prayer chokers, necklaces, jewelry and other items. In connection with the <u>Acquin</u> case, I was faced with a request for such religious necklaces. Again, I consulted with Native American religious experts. It was decided that a standard leather headband would be made available through the Commissary. I refused to allow multiple necklaces, prayer chokers and other jewelry items. Instead, a standard medicine

bag is available for Native Americans, or indeed for anyone who chooses to obtain one from the Commissary. The rule for each religion is one standard, plain colored necklace, whether it is rosary beads, Dikr beads, or a medicine bag. Such uniformity of treatment promotes security by reducing contraband, and reducing security threats caused by gangs, jealousy or perceptions of favoritism.

13. The Department of Correction's primary mission is to protect the public, protect staff, and ensure a safe and humane environment for offenders within a climate that promotes professionalism, respect, integrity, dignity and excellence. I fully understand the importance and significance of wearing Santeria beads, and notwithstanding the fact that this might be one of the most important religious practices desired by plaintiff, it is even more important for any Commissioner of Correction to take reasonable measure to protect plaintiff's life. This can only be accomplished by a complete prohibition on colored beads. It is my opinion that the present opportunities available and reasonable management of religious items are all justifable in terms of compelling security reasons. Any expansion of these would go beyond the constitutional and statutorily requirements and would have a significant impact on the safety and security of the correctional institutions.

I have read the foregoing and it is all true and accurate.

_____
John J. Armstrong

Subscribed and sworn to before me this 15 day of December, 2005

_____
Commissioner of the Superior Court

DEFENDANTS

Jack Tokarz, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel.: (860) 808-5450
Fax: (860) 808-5591
E-Mail: steven.strom@po.state.ct.us
Federal Bar #ct01211

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following this 30th day of January, 2006:

Carlos Llorens, #222201
Cheshire CI
900 Highland Ave.
Cheshire, CT 06410

_____
Steven R. Strom
Assistant Attorney General