UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS LLORENS<br>*Plaintiff,* | PRISONER<br>CIVIL NO. 3:CV1717(AVC)(TPS) |
| v. | |
| JACK TOKARZ, ET AL.,<br>*Defendants.* | JANUARY 27, 2006 |

### AFFIDAVIT OF BRIAN K. MURPHY
### IN SUPPORT OF SUMMARY JUDGMENT

I, Brian K. Murphy, being duly sworn, depose and say that:

1. I am the Deputy Commissioner for Operations for the Connecticut Department of Correction. I am over the age of eighteen and understand the nature and meaning of an oath.

2. I have been employed by the Department of Correction (DOC) since July 1981 when I started as a correctional officer at Somers CI. I have attached hereto my resume which is incorporated by reference herein.

3. During the administration of former Commissioner Larry Meachum, I was the Director for Security for the DOC. In that role I helped design and implement Administrative Directive 6.14, and I testified in a number of state habeas cases as to the need for the implementation of A.D. 6.14 which was a proactive approach to identifying, separating, managing, and controlling Security Risk Group (SRG) members and threat members. Connecticut became a national leader in correctional management in assertively and actively identifying SRG's in the DOC facilities. Prior to the first effective date of A.D. 6.14, SRG inmates caused numerous significant inmate on inmate assaults, including, for example, one

incident at Somers in which an inmate who was locked in his cell was badly burned when a rival SRG inmate threw a flammable liquid accelerant in the cell, and threw a book of matches on the inmate lighting the inmate on fire. Dormitories housing large numbers of inmates were places that SRG's used the recruit other, under threats of serious bodily harm or even death. Extortion, coercion, and fear was the common prevailing atmosphere in many of these open dormitory housing areas, until A.D. 6.14 was implemented and enforced by the DOC. During that time inmates wore their colors, including multi-color bead necklaces, and any inmate who "disrespected" the colors would get a "beat down." Any inmate who refused to undertake a "mission" to assault a rival inmate himself would suffer a "beat-down."

4. The removal of gang colors and the prohibition on possessing any gang colors, has greatly helped in reducing inmate on inmate assaults, as well as large scale disturbances involving rival SRG's and has also reduced inmate on staff assaults. Inmates are also governed by A.D. 9.5, the Code of Discipline which provides in paragraphs 10. U and 10 V. as follows:

> U. <u>Security Risk Group Affiliation</u>. Possessing or displaying any materials, symbols, colors or pictures of any identified security risk group; or behaviors uniquely or clearly associated with a security risk group.
> V. <u>Security Risk Group Safety Threat</u>. Activity, behavior, status as a recognized Security Risk Group Leader or involvement in an event associated with a Security Risk Group which jeopardizes the safety of the public, staff or other inmate(s) and/or the security and order of the facility.

Thus, even possession of the colored beads which plaintiff wishes to possess could subject him to both discipline as well as the protective management measures of A.D. 6.14.

5. New York City DOC does not have such a SRG program. In fact, inmates at Rikers do not even wear standard color uniforms issued by the City of New York. Inmates remain in street

2

clothing, and inmates are able to identify one another by gang colors. Certain telephones, for example, are controlled by the gangs, so that a particular telephone may only be used by Latin Kings, or Bloods or Crips. Inmate control of housing areas, television sets, and other aspects of jail life in Rikers, resulting in large numbers of assaults, has led to a large number of uses of force by staff, including responses by the emergency response team in full riot gear, resulting in an unusually high number of head injuries to inmates. See e.g. "In City Jails, a Question of Force; Blows to Inmates' Heads Are Too Routine, a Lawsuit Charges" *Sunday New York Times* (October 30, 2005) By JULIA PRESTON (NYT); Metro Section 1, Page 31, (copy attached)

6. Many jail and prison systems either were or still are in denial about the gang problem. Fearing that they would give too much status or legitimacy to the gangs, prison systems failed to take the assertive, proactive management approach provided for in A.D. 6.14. After Connecticut implemented its SRG program, and managed the threats posed by SRG Threat Members, by putting them in segregated, close custody housing units, there were dramatic reductions in assaults in Connecticut DOC facilities. Many other jurisdictions, including the Federal Bureau of Prisons (BOP), visited Connecticut's SRG close custody program, which was initially housed at Garner CI and is now housed at Northern CI. Other jurisdictions including the BOP modeled their gang management and control programs along the model that we had first established here in Connecticut.

7. It would be a significant loophole in the SRG directive to allow inmates to wear multi-color bead necklace under the guise of religious practice, which would open up the floodgates to dozens if not hundreds of requests to wear various colored items for religious reasons. For example, we have had serious issues with the use of colored bandanas, which were claimed to be

3

"religious headbands" for Native American inmates. These colored bandanas could be concealed in a pocket, and when the red or blue tip of the bandana was pulled out of the pocket, it was a signal to others that the inmate was "flying the flag," and was a signal to start an incident or assault, or even a large scale disturbance. The use of colored bead necklaces, which could not ever be successfully hidden under a T-shirt, would have the same negative effects, and would lead to the same negative atmosphere of threats and coercion due to pressure to wear certain colors to show allegiance to certain SRG's.

8.  I have read the affidavit of Major Luis Irizarry and I agree completely with the facts stated therein, and incorporate them herein as if fully stated below.

9.  I am particularly concerned for the personal safety of the plaintiff, Carlos Llorens, who is in Protective Custody (PC) due to his conviction for murder, in violation of Conn. Gen. Stat. §53a-54a, serving a sentence of 35 years, for the killing of another Latin King member. See mittimus and presentence investigation (PSI) attached hereto. The beads that were used by SRG's are exactly the same, size and type used in religious necklaces, specifically Santeria necklaces. The colors requested by this plaintiff are the same combination of colors used by these SRG's and would likely result in serious harm or death to the plaintiff, who would be perceived by others to be a member of an SRG which is an enemy of the Latin Kings. Plaintiff's attorney, Frank Riccio, wrote a letter to the Department of Correction (DOC) dated March 24, 1995, stating, in part, that there is a contract on plaintiff's life from the Latin Kings, and that if not housed in PC that plaintiff would be "dead within a week." See Riccio letter dated March 24, 1995, copy attached to Irizarry affidavit, and hereto.

I have read the foregoing and it is all true and accurate to the best of my knowledge and belief.

_____
Brian K. Murphy

Subscribed and sworn to before me this __30__ day of January, 2006.

_____
Steven R. Strom
Commissioner of the Superior Court

DEFENDANTS
Jack Tokarz, et.al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel.: (860) 808-5450
Fax: (860) 808-5591
Federal Bar #ct01211
E-Mail: steven.strom@po.state.ct.us

### CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following this 30th day of January, 2006:

Carlos Llorens, # 222201
Cheshire Correctional Institution
900 Highland Avenue
Cheshire, CT 06410

_____
Steven R. Strom
Assistant Attorney General

6