UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | PRISONER |
| CARLOS LLORENS | : | CIVIL NO. 3:CV1717(AVC)(TPS) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| JACK TOKARZ, ET AL., | : | |
| *Defendants.* | : | JANUARY 30, 2006 |

## DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Local Rule 56(a)(1) the defendants submit the following facts which are not in material dispute.

1.  Luis Irizarry is  employed by the Department of Correction (DOC), currently holding the rank of correctional major, assigned to the Bridgeport Correctional Center.  He previously held the rank of captain, assigned to the DOC's Security Division.  He had an office at Department of Correction Central Office, 24 Wolcott Hill Road, Wethersfield, CT 06109.  As part of his job responsibilities, he was assigned to coordinate and facilitate management of Security Risk Groups (SRG's) and advise the Director of Security, Dennis Jones, re: Gang intelligence, monitoring security and management issues, in accordance with A.D. 6.14, copy attached to Irizarry Affidavit. He  presently continues to be involved in SRG intelligence and monitoring SRG groups in DOC. As such, he is familiar with the facts stated in his affidavit and herein. Irizarry affidavit, ¶2.

2.     The Department of Correction (DOC) has a written policy directive, A.D. 6.14, which governs how the DOC manages inmates affiliated with gangs, which are called Security

Risk Groups (SRG), and provides for the close custody monitoring of such groups, as well as segregated management for inmates classified as Security Risk Group Safety Threat Members (SRGSTM). Paragraph 5 of A.D. 6.14 provides, in part,

> **S**uch monitoring and reporting shall include organizational structure, chain of command, bylaws, creed, names and titles of individual inmates connected with Security Risk Groups and **_identifying colors_**, tattoos, hand signals or other common identifiers.  **(emphasis added).**

Inmates are also governed by A.D. 9.5, the Code of Discipline which provides in paragraphs 10. U and 10 V. as follows:

> U. <u>Security Risk Group Affiliation</u>. Possessing or displaying any materials, symbols, colors or pictures of any identified security risk group; or behaviors uniquely or clearly associated with a security risk group.
>
> V. <u>Security Risk Group Safety Threat</u>. Activity, behavior, status as a recognized Security Risk Group Leader or involvement in an event associated with a Security Risk Group which jeopardizes the safety of the public, staff or other inmate(s) and/or the security and order of the facility.

Thus, even possession of the colored beads which plaintiff wishes to possess could subject him to both discipline as well as the protective management measures of A.D. 6.14.   Irizarry aff.¶15; See A.D. 6.14; A.D. 9.5, Affidavit of Deputy Commissioner Brian Murphy, ¶ 4, ¶8.

3.    Major Irizarry has testified in several federal and state cases, both civil and criminal, concerning gang issues, intelligence and management of gangs in the State's Department of Correction, as well as having provided sworn affidavit testimony. Irizarry aff.¶3.

4.    With regard to Santeria beads, allowing colors other than one solid color, white, would pose a threat to safety and security of  DOC facilities, inmates and staff. In this case, allowing plaintiff to wear such colors would pose an unacceptable threat to his own safety, and

2

would unreasonably jeopardize plaintiff's life. See Irizarry affidavit, ¶4; Riccio letter dated March 24, 1995, attached thereto; Armstrong aff.¶ 4.; Murphy aff. ¶¶ 8, 9.

5.      In the past, Major Irizarry has personal knowledge and experience, for example, with rosary beads, all strung from one solid color, blue, and altered by the addition of only one red bead.  This rosary was contraband and was used as an identifier for the SRG (Security Risk Group), Los Solidos.  The Solidos colors are red and blue. Irizarry aff ¶5.

6.      Other security risk groups use other colors as identifiers.  Latin Kings use black and gold or yellow.  The Netas use red, white and black, and the Bloods use red, and 20 Love uses black and green – see  list attached to Irizarry affidavit; Id. ¶4. Valeriano aff. ¶ 5. The colors that inmate Llorens wants to wear are colors which are identical to known and designated SRG's. For example, Mr. Llorens wanted to wear red beads and also wear blue and white beads. Blue is a color associated with the Crips.  Blue and red is associated with the Solidos, a rival SRG of the Latin Kings. Plaintiff also wants to wear green and black beads, which are the colors of the 20-Love. See   lists from both   Mr. Llorens, and the list of colors known by Gang Intelligence Coordinators to be the verified colors of the gangs attached to Valeriano affidavit

7.      The beads that were used by SRG's are exactly the same, size and type use in religious necklaces, specifically Santeria necklaces. The colors requested by this plaintiff are the same combination of colors used by these SRG's and would likely result in serious harm or death to the plaintiff, who would be perceived by others to be a member of an SRG which is an enemy of the Latin Kings. Plaintiff is in Protective Custody (PC) due to his murder of a Latin King member. His attorney, Frank Riccio, wrote a letter to the Department of Correction (DOC) dated March 24, 1995, stating, in part, that there is a contract on plaintiff's life from the Latin Kings,

and that if not housed in PC that plaintiff would be "dead within a week." See Riccio letter dated March 24, 1995, copy attached to Irizarry affidavit; Id. ¶ 7.

8.       Inmates, by altering religious necklaces when colored necklaces were previously allowed, were able to show the gang identifiers for the particular gang, as well as status within the gang.  For example, a particular pattern, 5 black followed by 5 gold, would be for a regular member of the Latin Kings, all black would be for "Terminators", a faction of the Latin Kings. Crown Members (leaders) might wear 5 black beads, followed by 2 gold beads. Id. ¶8.

9.       In the last ten years, SRG activity has been closely monitored, controlled and reduced, limiting the violence in Department of Correction facilities. Id. ¶9; Valeriano ¶¶7-9.

10.       This is evident by the reduction in the numbers of assaults, fights and physical confrontations. Indeed, the number of inmate-inmate assaults decreased approximately 50%, in part, due to strict prohibitions on possessing any type of SRG (gang) colors. These colors have clearly been used in the past to not only "represent" a  SRG for the purpose of recruitment, but also to give instructions to initiate a "mission," or to give a signal to assault of a particular inmate. Id. ¶10

11.       It is undisputed that professional correctional standards require not merely control of SRG colors, including bead necklaces, but a complete prohibition of such colors, as an important management tool to help in a comprehensive approach to reduce SRG activity. Allowing wearing of the necklaces under the T-shirt, would not reduce the risk to plaintiff's safety, and would allow for the widespread introduction of such SRG colors. Id. ¶11

12.     Inmates will use any loop hole, including an allowance for "religious bead necklaces"  to use these items to signify or represent their membership in gangs, and or to give code messages or secret signals to other inmates. Id. ¶12

13.     The wearing of beads under clothing will not eliminate their use in gang activity. These colors would still be used by inmates to represent gang membership and leadership to other inmates, on a daily basis. Inmates are commonly found to be bare chested in the housing units,  for example when walking from their cell across the dayroom to go to the shower, while, showering, washing up in the bathroom, playing at recreation in the yards or gym or the many times that these necklaces are exposed to view by other inmates. Allowing inmates to wear the necklaces under the clothing would be a totally ineffective means of controlling such powerful gang symbols. Irizarry aff. ¶13.

14.     A simple necklace of a certain color can be used as a red light/green light to give approval to a "mission" which could be an attack on another inmate or a staff person. Id. ¶14.

15.     Simple possession of these colored bead necklaces would be cause for a disciplinary report for SRG affiliation.   See Administrative Directive 9.5, Administrative Directive 6.14.  To Major Irizarry's knowledge, New York DOC did not give disciplinary reports for SRG Affiliation for mere possession of SRG colors. Id.¶15.

16.     The best and only way to control and continue to control gang activities is to prohibit all colors, which can be used as gang identifiers.  Allowing such colored beads into a facility will promote trading, and altering items, often under threats of fear for gang members which will cause the beads and necklaces to be used by SRG inmates to communicate and carry out their activities. Irizarry aff.¶16.

17.     Indeed, allowing this plaintiff to wear colored beads would be unduly hazardous to his own individual safety. This plaintiff, inmate Carlos Llorens, is already in Protective Custody housing. There are a fairly large number of inmates in Protective Custody (PC) housing who are former SRG members, who have been forced into PC by virtue of their prior SRG activities and on-going threats of retribution or retaliation. Irizarry aff.¶17.

18.     Specifically, with regard to this plaintiff, Carlos Llorens, is in PC due to his conviction for murder,  in violation of Conn. Gen. Stat. §53a-54a, serving a sentence of  35 years, for the killing of another Latin King member. Id.¶18; see mittimus attached to affidavit of Deputy Commissioner Brian Murphy; Murphy aff.¶ 9.

19.     The Department of Correction has made tremendous progress in controlling the SRG's by enforcing such prohibition and standardizing religious articles.  DOC knows from training, networking at National Conference, including the National Gang Management Task Force and resources such as the Department of Justice Manual for Security Threat Groups, that SRG's often use religion to cover up their SRG activities.  Irizarry aff.¶19; Valeriano aff. ¶ 4, 7.

20.     There is historical evidence of SRG activities by other so-called religious groups, for example, the Five Percenters who have been involved in SRG activities in other states such as New Jersey, South Carolina and elsewhere. Irizarry aff.¶20.

21.     Based on the affidavits of Major Irizarry, Captain Valeriano, former Commissioner Armstrong, and Deputy Commissioner Brian Murphy, the Court finds  it would present an unacceptable and substantial risk of serious harm to the plaintiff to allow him to wear different colored Santeria bead necklaces, which could lead to serious injury or even death. See Riccio letter, March 24, 1995. Irizarry aff.¶21; Murphy aff. ¶ ¶ 8, 9; Armstrong aff. ¶4.

22.     Captain Valeriano is employed by Connecticut Department of Correction (DOC). He is a captain at the Security Division of the DOC, with an office at 24 Wolcott Hill Road, Wethersfield, CT. He is the Security Risk Group coordinator for the DOC.  Valeriano aff. ¶1.

23.     As part of his job responsibilities, Captain Valeriano  is assigned to coordinate and facilitate management of Security Risk Groups (SRG's) and advise the Director of Security, Dennis Jones, re: Gang intelligence, monitoring security and management issues, in accordance with A.D. 6.14. He  presently continues to be involved in SRG intelligence and monitoring SRG groups in DOC. Valeriano  aff. ¶2.

24.     As recently as November 17, 2005, Commissioner Lantz issued a memo to all wardens stating that there are eleven SRG groups officially designated pursuant to Section 4. C. of Administrative Directive 6.14. See list attached to Valeriano affidavit.  Captain Valeriano's duties include updating the Director of Security as to all of the factors listed in A.D. 6.14, section 4.A , to insure the continued monitoring of groups as they evolve and change over time. Valeriano  aff. ¶3.

25.      As a result of the close monitoring and close custody management of SRG inmates, inmates have been removed from general population, which has continued to result in reduced numbers of inmate  on inmate assaults, reduced numbers of assaults on staff, as well as reduced number of SRG designations. Because inmates are identified, in part, by their colors, wearing of such colors presents not only a disciplinary violation, but also a means to represent an inmate's SRG affiliation. By prohibiting such colors, and removing SRG inmates from general population setting the DOC has been able to reduce the numbers of SRG designations. This means that  DOC facilities are not being used by gangs as a  breeding ground for large scale

recruiting, because there are significant consequences which are attached to being identified and managed as an SRG member. The elimination of colors, and the enforcement of the prohibition on gang colors has resulted in facilities which are far more safe for both inmates and staff. Valeriano aff. ¶4.

26.     The colors that inmate Llorens wants to wear are colors which are identical to known and designated SRG's. For example, Mr. Llorens want to wear red and black beads. These are the colors worn by the Bloods. Plaintiff wants to also wear blue and white beads. Blue is a color associated with the Crips.  Blue and red is associated with the Solidos, a rival SRG of the Latin Kings. Plaintiff also wants to wear green and black beads, which are the colors of the 20-Love. See lists from both  Mr. Llorens, and the list of colors known by Gang Intelligence Coordinators to be the verified colors of the gangs. Valeriano aff. ¶5 and list attached thereto.

27.     Once gang colors are reintroduced into correctional facilities, under the guise of religion, it would be impossible to keep inmates from sharing items, restringing the beads to make different color combinations, and using beads as a form of code, to indicate not only SRG membership, but also the rank and hierarchy of positions within the gangs. There is no adequate solution to allowing inmates to wear these necklaces under T-shirt. They would still be visible at the back of the neck, and during times when inmates go bare-chested, for example in the housing units, going to and from showers, or during recreation activities in the gym or yard, during warm weather. Valeriano aff.¶6.

28.     Connecticut DOC has been a leader in the nation in implementing an effective SRG management program. Connecticut's programs have served as a model for other jurisdictions, including the Federal Bureau of Prisons. Connecticut hosted one of the first

National Major Gang Task Force Conferences. The National Major Gang Task Force (NMGTF) is committed to providing leadership and information within the criminal justice system and other stakeholders to minimize the effects of security threat groups, gangs and terrorists in jails, prisons and communities. See http://www.nmgtf.org/; Valeriano aff. ¶7.

29.     The NMGTF has been nationally recognized in the criminal justice system for achieving uniqueness in gang intervention and management strategies. The integration and partnerships between corrections, law enforcement, military and education has resulted in obtaining successful state criminal indictments and Federal Racketeer Influence Corrupt Organization (RICO) prosecutions with multiple defendants. In addition the NMGTF Executive Board members and State Coordinators have provided valuable technical assistance in the development of state-wide gang/security threat group programs in numerous jurisdictions. Connecticut has been a leader in this process, and the methods used by Connecticut have become leading standards across the country. As part of his duties, Captain Valeriano is  the Connecticut state coordinator to the NMGTF. Valeriano aff. ¶8.

30.     In Captain Valeriano's professional opinion, it would be a grave security mistake to allow various colored Santeria beads to be introduced into the correctional environment. It would inevitably lead to a flood of similar claims by other inmates for a variety of multi-colored religious objects, e.g. headwear, bandanas, headbands, and other items, and in this case, would seriously jeopardize not merely safety and security in general, but also the personal safety of the plaintiff, who has been the target of death threats and a contract on his life by the Latin Kings. Valeriano aff. ¶9.

31.  Captain Joseph Carlone is employed by Connecticut Department of Correction and is an administrative captain at Cheshire CI. Carlone aff.¶1

32.  Captain Carlone's duties include but are not limited to various facility and other investigations which arise including incidents with inmates, staff, as well as outside law enforcement. In June 2005, for example, Captain Carlone was included among the ranks of law enforcement personnel from across Connecticut who were recognized at the United States Attorneys Eighth Annual Awards presentation. He was honored for his role in the successful prosecution of a crime of, "Threatening to Use a Weapon of Mass Destruction and Delivery." The incident involved an inmate who had sent a white powder, claimed to be anthrax, to a prosecutor's office. Carlone aff.¶2.

33.  As part of his duties Captain Carlone took digital photographs in the cell of inmate Carlos Llorens, #222201, with particular attention and detail focused on a so-called, self described "shrine," which was located on a lower shelf area, hidden from general viewing by a towel that was placed over the top of the shelf, and which hung down as a curtain or drape, shielding the objects on the shelf from public view. Carlone aff.¶3 and pictures attached thereto.

34.  The photographs attached to Captain Carlone's affidavit truly and accurately depict the items maintained by Carlos Llorens on this shelf and truly and accurate represent exactly how the shelf appeared on December 14, 2005, the date Captain Carlone took the pictures. The shelf continues to be used and maintained by Mr. Llorens in this same manner on the date of Captain Carlone's affidavit, and it has been so maintained, without any major disruption or prohibition by staff for a number of years. Carlone aff.¶4 and pictures attached thereto.

35.     Plaintiff has in his cell plastic bottles of oils, which may be purchased in the commissary. He also has approved Tarot cards, pictures of religious figures, such as saints, dominoes, rosary beads, a leather like puch or medicine bag, and other religious items on the shelf area in his cell. Carlone aff.¶3 and pictures attached thereto; Bruno aff. ¶ 14.

36.     Smoking, as well as the possession of matches or lighters, is prohibited in all DOC facilities. See Conn. Gen. Stat. §19a-342. (Formerly Sec. 1-21b).   which provides in relevant part:  "Smoking  prohibited. Exceptions. Signs required. Penalties.   (a) As used in this section, "smoke" or " smoking " means the lighting or carrying of a lighted cigarette, cigar, pipe or similar device.  (b) (1) Notwithstanding the provisions of section 31-40q, no person shall smoke: (A) In any building or portion of a building owned and operated or leased and operated by the state or any political subdivision thereof;…"

37. Brian Murphy is the Deputy Commissioner for Operations for the Connecticut Department of Correction. Murphy aff. ¶1.

38. Deputy Commissioner Murphy has been employed by the Department of Correction (DOC) since July 1981 when he started as a correctional officer at Somers CI. Deputy Commissioner Murphy attached his resume  to his affidavit which is incorporated by reference herein. Murphy aff. ¶2.

39. During the administration of  former Commissioner Larry Meachum, Mr. Murphy was the Director for Security for the DOC. In that role he helped design and implement Administrative Directive 6.14, and he testified in a number of state habeas cases as to the need for the implementation of A.D. 6.14 which was a proactive approach to identifying, separating, managing, and controlling Security Risk Group (SRG) members and threat members.

Connecticut became a national leader in correctional management in assertively and actively identifying SRG's in the DOC facilities. Prior to the first effective date of A.D. 6.14, SRG inmates caused numerous significant inmate on inmate assaults, including, for example, one incident at Somers in which an inmate who was locked in his cell was badly burned when a rival SRG inmate threw a flammable liquid accelerant in the cell, and threw a book of matches on the inmate lighting the inmate on fire. DOC facilities no longer allow inmates to have flammables, and tobacco and tobacco products, cigarettes, pipes, herbs, candles and incense are all contraband. Murphy aff. ¶3; A.D. 6.10, Inmate property

40. Dormitories housing large numbers of inmates were places that SRG's used the recruit other, under threats of serious bodily harm or even death. Extortion, coercion, and fear was the common prevailing atmosphere in many of these open dormitory housing areas, until A.D. 6.14 was implemented and enforced by the DOC. During that time inmates wore their colors, including multi-color bead necklaces, and any inmate who "disrespected" the colors would get a "beat down." Any inmate who refused to undertake a "mission" to assault a rival inmate himself would suffer a "beat-down." Murphy aff. ¶3

41. New York City DOC does not have such a SRG program. In fact, inmates at Rikers do not even wear standard color uniforms issued by the City of New York. Inmates remain in street clothing, and inmates are able to identify one another by gang colors. Certain telephones, for example, are controlled by the gangs, so that a particular telephone may only be used by Latin Kings, or Bloods or Crips. Inmate control of housing areas, television sets, and other aspects of jail life in Rikers, resulting in large numbers of assaults, has led to a large number of uses of force by staff, including responses by the emergency response team in full riot

gear, resulting in an unusually high number of head injuries to inmates. See e.g. "In City Jails, a Question of Force; Blows to Inmates' Heads Are Too Routine, a Lawsuit Charges" *Sunday New York Times* (October 30, 2005) By JULIA PRESTON (NYT); Metro Section 1, Page 31, (copy attached to Murphy affidavit) Murphy aff. ¶5.

42.    Many jail and prison systems either were or still are in denial about the gang problem. Fearing that they would give too much status or legitimacy to the gangs, prison systems failed to take the assertive, proactive management approach provided for in A.D. 6.14. After Connecticut implemented its SRG program, and managed the threats posed by SRG Threat Members, by putting them in segregated, close custody housing units, there were dramatic reductions in assaults in Connecticut DOC facilities. Many other jurisdictions, including the Federal Bureau of Prisons (BOP), visited Connecticut's SRG close custody program, which was initially housed at Garner CI and is now housed at Northern CI. Other jurisdictions including the BOP modeled their gang management and control programs along the model that we had first established here in Connecticut. Murphy aff. ¶6

43.    It would be a significant loophole in the SRG directive to allow inmates to wear multi-color bead necklace under the guise of religious practice, which would open up the floodgates to dozens if not hundreds of requests to wear various colored items for religious reasons. For example, we have had serious issues with the use of colored bandanas, which were claimed to be "religious headbands" for Native American inmates. These colored bandanas could be concealed in a pocket, and when the red or blue tip of the bandana was pulled out of the pocket, it was a signal to others that the inmate was "flying the flag," and was a signal to start an incident or assault, or even a large scale disturbance. The use of colored bead necklaces, which

could not ever be successfully hidden under a T-shirt, would have the same negative effects, and would lead to the same negative atmosphere of threats and coercion due to pressure to wear certain colors to show allegiance to certain SRG's. Murphy aff. ¶7

44.     Deputy Commissioner Murphy is particularly concerned for the personal safety of the plaintiff, Carlos Llorens, who is in Protective Custody (PC) due to his conviction for murder, in violation of Conn. Gen. Stat. §53a-54a, serving a sentence of  35 years, for the killing of another Latin King member. See mittimus and presentence investigation (PSI) attached to Murphy affidavit. The beads that were used by SRG's are exactly the same, size and type used in religious necklaces, specifically Santeria necklaces. The colors requested by this plaintiff are the same combination of colors used by these SRG's and would likely result in serious harm or death to the plaintiff, who would be perceived by others to be a member of an SRG which is an enemy of the Latin Kings. Plaintiff's attorney, Frank Riccio, wrote a letter to the Department of Correction (DOC) dated March 24, 1995, stating, in part, that there is a contract on plaintiff's life from the Latin Kings, and that if not housed in PC that plaintiff  would be "dead within a week." See Riccio letter dated March 24, 1995, copy attached to Irizarry and Murphy affidavits. Murphy aff. ¶ 9.

45.     Dwayne Bickford is a Correctional Officer at CCI-Cheshire. As of his February 2003 affidavit, he had been employed by the Connecticut Department of Correction for approximately eleven years. As of this date, he has been employed for approximately fourteen years. Mr. Bickford has personal knowledge of the matters set forth in this affidavit, and he has certified the accuracy of the copies attached thereto. Bickford aff. ¶1.

46.    On March 15, 2002  Correction Officer Bickford wrote a disciplinary report for Inmate Llorens, #222201, for gambling. A true and accurate copy of his  report is attached to Bickford's  affidavit. Bickford aff. ¶2.

47.    On that date March 15, 2002 Bickford was instructed by his Unit Manager, Captain Holmes, to conduct routine cell "shakedowns" or cell inspections of all of the items in cell NB5-44. Correction Officer Bickford inspected cell 44 looking for contraband,  that is any item that an inmate is not authorized to have,  or an item which may be authorized but is used in an unauthorized manner. He found betting slips right in plain view on the table in the cell.  He also observed excessive commissary items, which led me to believe the inmates who occupied cell 44, inmates Llorens and Camacho were running an unauthorized "store" or betting operation." Commissary is often wagered in connection with inmate betting activities. All of these activities are in violation of DOC rules, and could lead to serious security problems when inmates become indebted to other inmates. Bickford aff. ¶3.

48.    Correction Officer Bickford spoke to inmate Llorens and his cell partner and asked whose betting slips they were. Mr. Llorens stated that some of the slips were his and some were his cellmate's. The cellmate, inmate Camacho, also stated that some were his and some belonged to Mr. Llorens. Bickford aff. ¶4.

49.    Captain Holmes, the Unit Manager, also came to the cell due to the excessive commissary items. Correction Officer Bickford was directed to issue a disciplinary report for both inmates charging them both with gambling. Bickford aff. ¶5.

50.    Correction Officer Bickford has no knowledge of Mr. Llorens with regard to his religious practices and belief. Correction Officer Bickford never discussed Mr. Llorens' religion

with him or anybody else. It is a basic correctional practice taught in the pre-service training for any correctional officer never to engage any inmate in discussions of religion or politics, and Correction Officer Bickford never discussed these topics with any inmate or Mr. Llorens. Bickford aff. ¶6.

51.    Correction Officer Bickford did not take any religious papers from inmate Llorens' cell. The only papers Correction Officer Bickford took were betting slips, copies of which are attached to Bickford's affidavit. These handwritten lists included the names of teams with point spreads. Bickford aff. ¶7.

51.    Correction Officer Bickford had no knowledge of this lawsuit nor the subject matter of this lawsuit prior to reviewing and signing his affidavit. Correction Officer Bickford did not know why Mr. Llorens made this claim against him other than to guess that he interrupted his betting operations and Mr. Llorens is getting back against Correction Officer Bickford for that. Bickford aff. ¶8.

52.    All of Correction Officer Bickford's conduct in connection with the disciplinary report attached hereto is activity undertaken within the scope of his duties as a correctional officer at Cheshire CI, to maintain safety and security, in part, by enforcing the Code of Penal Discipline, A.D. 9.5, disciplinary rules written for inmates which Correction Officer Bickford is charged with enforcing. Bickford aff. ¶9.

53.    At all times Correction Officer Bickford reasonably believed that his conduct was completely lawful, authorized by the rules of the Department, and approved by his unit manager. Bickford aff. ¶10.

54.    Correction Officer Bickford does not know from first hand knowledge what was the result of the disciplinary proceedings, and he did not participate in those proceedings. His report was turned in to a supervisor, Lt. Donahue, who reviewed the report and assured delivery of the report to Mr. Llorens. Bickford aff. ¶11.

55.    John J. Armstrong  was the Commissioner of the Department of Correction (DOC) for the State of Connecticut, until my  retirement on March 11, 2003.  He began his career as a Correction Officer at the New Haven Correctional Center, 245 Whalley Ave., New Haven CT in 1977, approximately twenty-six years ago. In his many years of experience he also served as a correctional treatment officer, lieutenant, captain, major, deputy warden and warden. He served as the Warden of the Jennings Road Detention Center from February 1989 to October 1990.  He was the Warden of the Manson Youth Institution from October 1990 to March 1992. He also served as Director for Region I of DOC from March 1992 to January 1994, during which time he supervised the Wardens of CCI-Somers, Enfield CI, Carl Robinson CI, as well as Willard and Cybulski. He participated in much of the planning for Northern CI when it opened in March 1995. He was involved in much of the planning and transitioning of Somers to Osborn CI and the downgrading of Somers from a level 4 & 5 prison, then the state's only maximum security prison, to a level 3 facility.  He participated in the planning for the transfer of the Administrative Segregation program from Somers to Walker RSMU, and subsequently to Northern. Mr. Armstrong became Deputy Commissioner for Programs & Services under former Commissioner Meachum in 1994.  Among the responsibilities in this position he had general supervisory administrative authority over religious programs and services.  Mr. Armstrong was

17

appointed Commissioner by Governor Rowland in January, 1995.   Mr. Armstrong retired effective March 11, 2003.   Armstrong aff.¶2.

56.    Mr. Armstrong has testified in a number of state and federal cases as a qualified correctional expert, as well as given numerous affidavits and written several expert reports.  One of those reports was a case brought by Lorne Acquin, a Native American prisoner incarcerated at MacDougall Correctional Institution, concerning numerous religious practices claimed by Native American inmates including sweat lodge, smudging, sacred pipe and wearing religious necklaces, including beads. Armstrong aff. ¶3

57.    Mr. Armstrong has also given expert testimony in a wide variety of other cases claiming religious rights involving, for example, Muslim head wear, religious diets and allowing other cases seeking exceptions for religious reasons.  In addition, Mr. Armstrong applied his general and specific knowledge as the former Commissioner of Correction for the State of Connecticut, as a previous Deputy Commissioner, Warden and as a correctional supervisor and staff member for more than 26 years, as well as his knowledge of the obvious ripple effects among the inmate population which are inevitably caused by allowing exceptions on religious grounds to security policies and disciplinary rules which apply generally to all inmates in custody.  Mr. Armstrong's  review of the complaint, amended complaint, inmate correspondence from plaintiff, literature review, case review as well as conversations with DOC staff, and his general background also have made him familiar with the general situations involved in this complaint.   Importantly, it has recently been brought to Mr. Armstrong's attention that the plaintiff, Carlos Llorens, is serving 35 years for murder of a member of the Latin Kings.  Mr. Armstrong read the letter from Attorney Riccio dated March 24, 1995, and  reviewed the fact

that for the past ten years plaintiff has been housed in protective custody due to the alleged contract on his life put out by the Latin Kings, according to Attorney Riccio's letter. Allowing plaintiff to wear colored beads would in effect be a death warrant for him, in that he would be perceived to be a member of Security Risk Groups who are known rivals and enemies of the Latin Kings. It would be an abdication of the Commissioner's responsibility to protect the plaintiff even against his own wishes and lack of sound judgment, particularly regarding displaying colored beads. Such a display would be the equivalent of "flying the flag," a gang phrase for displaying colors for the purpose of identification. It would unreasonably jeopardize plaintiff's safety and would present a substantial risk of serious harm, including the risk of death, to allow plaintiff to wear multiple strands of colored beads, even if he were allowed those beads under his shirt. There are numerous times when inmates are naked to the waist, for example when walking across the day room to the shower, and at that time or in the shower, or gym, when playing without a shirt, the plaintiff's beads would be clearly visible to other inmates. There are no secrets in prison and the perception that plaintiff is a member of a SRG would be an unacceptable risk that could only be avoided by a complete prohibition on the possession of such colored beads. Armstrong aff. ¶4

58. Mr. Armstrong's ability to comprehensively discuss the issues is limited by an obvious conflict between the parties as to what the case is all about. The plaintiff's amended complaint filed October 11, 2002, as Mr. Armstrong understands it, clearly appears to be directed toward the plaintiff's alleged constitutional and statutory rights to wear multiple strands of colored Santeria beads. Plaintiff also seeks to individually engage in practice of Santeria religion, by maintaining a Santeria shrine in his cell. In effect the plaintiff does not allege nor

seek assistance from this court in being provided an equal opportunity for religion comparable to that provided to other religious groups with regard to "religious" beads or "shrines".   What he does complain of and what he does seek as relief is to have superior rights, greater privileges and immunity from generally applicable rules deliberately intended to reduce (SRG) gang activity, gang communication and control property, reduce contraband, and importantly reduce violence in Department of Correction facilities, a large part of which was caused by SRG activities. Armstrong aff. ¶5.

59.    It should be clear to this court that no Department of Correction can maintain safety and security if inmates are allowed special privileges or are allowed to hold and to exercise leadership roles over other inmates.  As noted by Judge Blumenfeld in Paka v. Manson, 387 F.Supp. 111, "[the] authoritarian 'boss' inmate is no chimera."  If the Commissioner were to allow this plaintiff to have a privileged status in wearing multiple necklaces of colored beads, using colors, which known SRG's also use, as well as to maintain an individual religious shrine with candles, incense and herbs in his cell, then the Commissioner would have to allow such property items, privileges and protections for all inmates. Armstrong aff. ¶6.

60.    In Connecticut, any inmate can voluntarily sign up to affiliate with any religion of his choice.  Mr. Armstrong has no doubt that inmates in gangs would see this opportunity to reintroduce gang colors into Department of Correction facilities. Armstrong aff. ¶7.

61.    To the extent that the plaintiff seeks the opportunity to have a "privileged" status based on religion, which is how Mr. Armstrong construes the Amended Complaint,  this Court should reject his claims in their entirety.   Among the most self evident, prominent and compelling reasons for prohibiting inmate leadership are competition, threats, extortion,

favoritism, perceptions of favoritism and gang activity.  In addition, and what Mr. Armstrong respectfully requests this court to be mindful of is the fact that at any given time there are approximately 19,000 or more inmates confined in the various correctional facilities administered by the Connecticut Department of Correction.  This case cannot be viewed as a demand by one inmate to have special privileges based on a religious exception, which is in itself dangerous.  The wearing of such colored bead necklaces has been in the past a known method for prison gangs to designate leadership within the gangs.  For example, a pattern of five black beads followed by two gold beads may mean an inmate is a member of the "corona" or "crown" leaders of the Latin Kings.  See Irizarry affidavit.   Thus, the overriding principal in this case concerns the alleged right of any one of more than 19,000 inmates to hold such power.  The concern for any inmate having any leadership or power over any other inmate, is a valid, indeed compelling security concern of correctional administrators like Mr. Armstrong.   Mr. Armstrong is also concerned about the ability of inmates to conceal contraband in religious shrines maintained in an inmate's cell, and being able to wear colored beads in the same gang colors used by gangs.  The risk of proliferation of non-authorized items in cell together with increased tensions between inmates and staff who are required on a daily basis to do detailed cell inspections ("shakedowns"), compels  Mr. Armstrong to conclude that plaintiff's demands are dangerous for safety and security.  Specifically, the demand to maintain "fruit" in the cell is particularly troubling, not only for sanitary reasons, but also because fruit may be used to produce a prison made alcoholic beverage, commonly called "pruno" by mixing fruit with sugar and letting the mixture ferment.   If the Commissioner Lantz were to allow fruit for one inmate, she would in effect allow all inmates to possess fruit in their cells.  This increase in contraband

would be both unsanitary and if pruno is made, which is likely, extremely hazardous to safety and security. Armstrong aff. ¶8.

62.     Mr. Armstrong's experience as a correctional administrator is such that he views the establishment of religious practice opportunities for inmates as a very important rehabilitative tool.  However, any Commissioner of Correction must always be alert for what is obviously the dominant theme of this case, i.e. inmate demands, even when sincerely claimed to be related to the practice of religion, which in effect, and in practice, relate to the opportunity, as noted by Judge Blumenfeld, in Paka v. Manson to be an inmate leader, which exposes inmates and staff to the very serious security problems noted above. The defednats must, more importantly than any other goal of corrections, be mindful of the safety of the plaintiff, as well as DOC staff. The introduction of colored beads would lead to multiple requests from various inmates, since what is allowed for one must be allowed for all. Armstrong aff. ¶9.

63.     Indeed, in Mr. Armstrong's view, the existing accommodations that the Department of Correction provides for the Santeria religion reasonably accommodates a number of Santeria requirements, compatible with safety and security, and are, in most  relevant respects, comparable to similar opportunities by other inmates of other religions in the Department of Correction.  Among the religious programs available for Santeria practitioners are the following: one plain white necklace to be worn under the clothing, audio and cassette tapes, books, reading materials, approved Santeria tarot cards, individual professional clergy visits from Department of Correction authorized community volunteers, such as the "Santeria priest" claimed in paragraph 23 of the Carlos Llorens case.  If plaintiff provided DOPC staff with the information concerning this "Santeria priest," he could have either of two kinds of visits, a professional clergy visit, if the

individual was so qualified and approved, or a social visit, if approved for the individual's social visiting list. Armstrong aff. ¶10.

64.     In Mr. Armstrong's eight-year tenure as Commissioner since 1995, he was faced with innumerable demands for religious articles.  Mr. Armstrong always tried to be fair and even handed in dealing with the multiple demands of a variety of religions.   Mr. Armstrong always considered safety and security first when trying to accommodate a particular request.   Mr. Armstrong also strived for equal treatment and relative parity amongst the competing demands for additional property items.  For example, when faced with demands for multiple colors and types of Islamic head wear, for example, fezes, turbans, Kufis of different colors, Mr. Armstrong decided, in consultation with Imams and religious experts, to limit the religious headwear for Muslims to one standard color, and one design, a close knit Kufi.  This is a standard item available in the Commissary. Armstrong aff. ¶ 11.

65.     Another example is in regard to the numerous different Native American tribes and Nations who may have demands for religious headbands, prayer chokers, necklaces, jewelry and other items.  In connection with the Acquin case, Mr. Armstrong was faced with a request for such religious necklaces.  Again, Mr. Armstrong consulted with Native American religious experts.  It was decided that a standard leather headband would be made available through the Commissary.   Mr. Armstrong refused to allow multiple necklaces, prayer chokers and other jewelry items.  Instead, a standard medicine bag is available for Native Americans, or indeed for anyone who chooses to obtain one from the Commissary.  The rule for each religion is one standard, plain colored necklace, whether it is rosary beads, Dikr beads, or a medicine bag.  Such

uniformity of treatment promotes security by reducing contraband, and reducing security threats caused by gangs, jealousy or perceptions of favoritism. Armstrong aff. ¶ 12.

66.    The Department of Correction's primary mission is to protect the public, protect staff, and ensure a safe and humane environment for offenders within a climate that promotes professionalism, respect, integrity, dignity and excellence. Mr. Armstrong  understands the importance and significance of wearing Santeria beads, and notwithstanding the fact that this might be one of the most important religious practices desired by plaintiff, it is even more important for any Commissioner of Correction to take reasonable measure to protect plaintiff's life. This can only be accomplished by a complete prohibition on colored beads.  It is Mr. Armstrong's opinion that the present opportunities available and reasonable management of religious items are all justifiable in terms of compelling security reasons.  Any expansion of these would go beyond the constitutional and statutorily requirements and would have a significant impact on the safety and security of the correctional institutions. Armstrong aff. ¶ 13.

DEFENDANTS
Jack Tokarz, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:  __/s/_____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel.:  (860) 808-5450
Fax: (860) 808-5591
E-Mail:  steven.strom@po.state.ct.us
Federal Bar #ct01211

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following this _____ day

of January, 2006:

        Carlos Llorens, # 222201
        Cheshire Correctional Institution
        900 Highland Avenue
        Cheshire, CT 06410

                                     /s/
                                Steven R. Strom
                                Assistant Attorney General